## WIGGAN *v.* CONOLLY.

### ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 225.   Submitted April 16, 1896. — Decided May 4, 1896.

The treaty of February 23, 1867, 15 Stat. 513, with the Ottawas and other Indians, introduced the limit of minority upon the inalienability of lands patented to a minor allottee, in that respect changing the provisions of the treaty of July 16, 1862, 12 Stat. 1237; and this limitation was applicable to lands then patented to minors under the treaty of 1867, and cut off the right of guardians to dispose of their real estate during their minority, even under direction of the court of the State in which the land was situated.

By the first article of the treaty of 1862, negotiated June 24, ratified July 16, and proclaimed July 28, 12 Stat. 1237, it was provided that — "The Ottawa Indians of the United Bands of Blanchard's Fork and of Roche de Bœuf, having become sufficiently advanced in civilization, and being desirous of becoming citizens of the United States, it is hereby agreed and stipulated that their organization and their relations with the United States, as an Indian tribe, shall be dissolved and terminated at the expiration of five years from the ratification of this treaty; and from and after that time the said Ottawas, and each and every one of them, shall be deemed and declared to be citizens of the United States, to all intents and purposes, and shall be entitled to all the rights, privileges and immunities of such citizens, and shall, in all respects, be subject to the laws of the United States, and of the State or States thereof in which they may reside."

The seventh article reads that—"Proper patents by the United States shall be issued to each individual member of the tribe and person entitled for the lands selected and allotted to them, in which it shall be stipulated that no Indian, except as herein provided, to whom the same may be issued, shall alienate or incumber the land allotted to him or her in any manner until they shall, by the terms of this treaty, become a citizen of the United States; and any conveyance or incumbrance of said lands, done or suffered, except as aforesaid, by any Ottawa Indian, of the lands allotted to him or her, made before they shall become a citizen, shall be null and void.

"And forty acres, including the houses and improvements of the allottee, shall be inalienable during the natural lifetime of the party receiving the title."

Esther Wilson, as appears by the census roll, duly certified by the Commissioner of Indian Affairs and the Secretary of the Interior, of date March 30, 1864, was an allottee under this treaty, and at that time a girl of the age of seven years. On December 1, 1865, a patent was issued to her for the land in controversy, the granting words of which are as follows:

"Now know ye, that the United States of America, in consideration of the premises, and pursuant to the third and seventh articles of the treaty aforesaid, have given and granted, and by these presents do give and grant unto the said Esther Wilson and to her heirs, the tract of land above described: Provided, however, and these presents are upon the express condition, and with the limitation as required by the treaty aforesaid, that the said Esther Wilson shall not alienate or incumber the aforesaid tracts of land until she shall become, by the terms of said treaty, a citizen of the United States; and any conveyance or incumbrance of said lands, done or suffered by said Esther Wilson, made before she shall become a citizen, shall be null and void; to have and to hold the said tracts of land, with the appurtenances, unto the said Esther Wilson and to her heirs and assigns forever, subject to the limitation and condition aforesaid."

On February 23, 1867, a treaty was negotiated between the United States and several Indian tribes, 15 Stat. 513, the scope

and purpose of which is disclosed by this recital in the preamble: "Whereas it is desirable that arrangements should be made by which portions of certain tribes, parties hereto, now residing in Kansas, should be enabled to remove to other lands in the Indian country south of that State, while other portions of said tribes desire to dissolve their tribal relations and become citizens."

Among the parties to this treaty were the Ottawa Indians. Certain amendments were suggested by the Senate on June 18, 1868, which were accepted by the Indians September 30, 1868, and the treaty proclaimed October 14 following. The third section provides for a cession by the Shawnees of a part of their reservation in the Indian Territory to the United States. The sixteenth recites that this ceded territory "is hereby sold to the Ottawas at one dollar per acre;" while the seventeenth section reads as follows :

"The provisions of the Ottawa treaty of one thousand eight hundred and sixty-two, under which all the tribe were to become citizens upon the sixteenth of July, one thousand eight hundred and sixty-seven, are hereby extended for two years, or until July sixteenth, one thousand eight hundred and sixty-nine; but at any time previous to that date any member of the tribe may appear before the United States District Court for Kansas, and declare his intention to become a citizen, when he shall receive a certificate of citizenship, which shall include his family, and thereafter be disconnected with the tribe, and shall be entitled to his proportion of the tribal fund; and all who shall not have made such declaration previous to the last mentioned date shall be still considered members of the tribe. In order to enable the tribe to dispose of their property in Kansas, and remove to their new homes and establish themselves thereon, patents in fee simple shall be given to the heads of families, and to all who have come of age among the allottees under the treaties of one thousand eight hundred and sixty-two, so that they may sell their lands without restriction, but the said lands shall remain exempt from taxation so long as they may be retained by members of the tribe, down to

the said sixteenth of July, one thousand eight hundred and sixty-nine."

On October 26, 1872, Benjamin Esterly, as the guardian of Esther Wilson, appointed such guardian by the probate court of Franklin County, State of Kansas, (in which county the lands in controversy are situated,) executed a deed to John Wiggan, which deed recites a sale of the entire 80 acres at private sale for the sum of $60, the confirmation of such sale by the probate court, and an order on the guardian to execute a deed. Subsequently the grantee therein, John Wiggan, conveyed to Horace Wiggan and Albert E. Wiggan. On February 17, 1881, the allottee, she having in the meantime been married, under the name of Esther King, commenced an action in the District Court of Franklin County against said last named grantees for the recovery of the possession of the lands. Trial being had, a judgment was rendered in her favor, which, on June 4, 1886, was affirmed by the Supreme Court of the State. On May 6, 1891, the death of Esther King was suggested, and an order of revivor entered by the Supreme Court in the names of her heirs at law, Alexander Conolly and John King, her husband and only child. On May 26, 1892, a writ of error was allowed by the chief justice of that court, and on June 20, 1892, there was filed an affidavit that one of the defendants, now plaintiff in error, Albert E. Wiggan, was a minor at the time of the judgment of affirmance, and had not attained his majority until within less than two years prior to the suing out of the writ of error. The case, therefore, in this court is pending between one of the original defendants and the heirs of the original plaintiff.

*Mr. Benjamin T. Duval* and *Mr. H. C. Mechem* for plaintiffs in error.

No appearance for defendants in error.

Mr. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The first question presented by counsel for plaintiff in error

is whether the treaty of 1867 was of any validity so far as respects the Ottawa Indians. The treaty of 1862 provided that at the expiration of five years from the date of its ratification, that is, on July 16, 1867, the Ottawas should become citizens of the United States, and the tribal organization and relations with the United States should be dissolved.

The treaty of 1867, though originally negotiated in February, was not concluded in that year, but was amended in 1868, and not ratified and proclaimed until October 14, 1868, and more than five years after the ratification of the treaty of 1862. At the time, therefore, that the later treaty took effect the Ottawa Indians had, it is contended, under and by virtue of the earlier treaty, become citizens not only of the United States but also of the State of Kansas, and hence the United States had no power to enter into treaty with them, citizens of a State, without the consent of that State. The Nation could not, without the consent of the State, withdraw citizens of the State from its jurisdiction.

We cannot yield our assent to this contention. The negotiations in February, 1867, were while the tribal organization and relations to the United States continued. They amounted substantially to a proposition by the tribe to change the treaty of 1862, and continue the tribal organization and relations with the United States. This was a valid act on the part of the tribe. And though the proposition was not accepted by the United States until after July 16, 1867, yet when accepted the acceptance related back to the date of the proposition. That some modifications were made in matters of detail did not affect the substantial character of the transaction. The tribe proposed to continue its organization and relations to the United States and the Government accepted the proposition. The State of Kansas has never objected, even if it had any right to object, and it does not lie in the power of an individual to assert any supposed political rights of the State or challenge the action of the Nation and the Indians in this behalf. The treaty of 1867 was valid and determined the status and rights of the Indians politically and in respect to their property.

The second proposition of counsel is that under the treaty of 1867 all the Ottawas became citizens on July 16, 1869, that the allottee Esther Wilson and her property became then subject to the jurisdiction and laws of the State of Kansas, and that a guardian's sale of her property made thereafter in conformity with the provisions of the laws of that State passed a valid title.

If the only provision in the treaty of 1867 affecting this question was the first clause of the seventeenth section there might be force in this contention, for that simply extends to July 16, 1869, the time for terminating the tribal existence and transforming all the members thereof into individual citizens of the United States and of the State in which they reside. Even then we should be confronted with the proposition that under the seventh article of the treaty of 1862 it was provided that forty acres, including therein the houses and improvements of the allottee, should be inalienable during his or her life. While that provision continued in force it may well be doubted whether a deed of the entire allotment, whether made by the individual or a guardian, would be sufficient to transfer a legal title to any portion of the allotment, and whether, prior to any such deed, there must not be a setting off to the allottee according to the demand of the treaty of the inalienable forty acres. It must be borne in mind that the proceeding in the state court was not in any sense one in partition, or an equitable suit to determine relative rights in a single tract, but was a legal action to recover possession, against which was set up simply an alleged legal title in defeat thereof.

But we do not care to rest our decision upon this suggestion. We think there is something more vital. The treaty of 1867 must be considered as an entirety in its relations to the treaty of 1862. By the treaty of 1862 the tribal organization was to disappear on July 16, 1867. If nothing had transpired after that, on that date the relations of the tribe to the United States would have ended, the members of the tribe would have had title to their lands, and they would have become, and been treated thereafter, as individual citizens of the United States

and of the State in which they resided.   But the treaty of 1867
contemplated a different outcome.   It proceeded upon the un-
derstanding that some at least of the Ottawas, as of the other
tribes, desired to remove from the State of Kansas to the Indian
Territory, and there continue tribal relations with the National
Government.   That is evidently the thought expressed in the
recital to the treaty of 1867.   Some of the Indians desired to
be citizens; some wanted to retain their tribal relations.   In
carrying out that express purpose the time for the dissolution
of the Ottawa tribe was postponed until July 16, 1869, with
the proviso that at any time prior thereto any individual mem-
ber could become a citizen at his election, and a further pro-
vision as to those who did not so elect, as thus expressed in
the seventeenth section, " all who shall not have made such
declaration previous to the last mentioned date shall be still
considered members of the tribe."   For what purpose " still
considered members "?   Simply to be at that instant changed
into citizens and to lose their tribal relation?   Obviously not;
but that they might, if they had not elected to become citi-
zens, remove to the Indian Territory, and continue their tribal
relations.   Emphasizing this thought is the subsequent sen-
tence, to the effect that in order to enable the tribe to dispose
of their property in Kansas and remove to their new homes
patents should be issued under certain conditions.   In other
words, the idea was that those Indians who did not elect to
become citizens should receive patents for their lands under
such circumstances and conditions as to enable them to dispose
of the lands and remove to the Indian Territory, and, there as
a fragment of the original Ottawa tribe, continue tribal rela-
tions with the Government.   The provision in reference to
patents must be considered as superseding those of the treaty
of 1862.   And by its term patents were to issue to the heads
of families and to all among the allottees coming of age, in
the language of the treaty " so that they may sell their lands
without restriction."   It does not appear that the allottee in
this case was the head of a family, and, according to the testi-
mony, she was a minor.   This treaty of 1867 introduced a new
limitation upon the inalienability of lands patented to a minor

allottee, that is, the limit of minority.  And such limit must be applied to sales voluntary and involuntary, and cut off the right of a guardian to dispose of the estate.  The fact that the patent to this allottee had already been issued did not abridge the right of the United States to add with the consent of the tribe a new limitation to the power of the individual Indian in respect to alienation.  The land and the allottee were both still under the charge and care of the Nation and the tribe, and they could agree for still further protection, a protection which no individual was at liberty to challenge.

It follows, therefore, that at the time of this assumed power of the guardian of Esther Wilson to dispose of her realty such realty was inalienable, and a deed made by the guardian, though under the authority of the probate court of the county of the State in which the lands were situated, conveyed no title.  That this conclusion renders ineffective an attempt to dispose of the lands of an Indian girl, at the price of seventy-five cents an acre, does not any the less commend it to one's sense of justice.

The judgment is

*Affirmed.*