Howet, J.,
delivered the following dissenting opinion:
The grave constitutional questions presented relate to the right of Congress to increase and extend the restrictions originally placed upon the alienation, encumbrance, and the right to lease certain lands of Cherokee citizens of the United States beyond the terms of an act approved July 1, 1902 (32 Stat., 716), under which allotments were made to individual Cherokees and for which separate certificates were issued for nontaxable homesteads made inalienable during the lifetime of the allottee not exceeding twenty-one years, but not liable in debt contracted by the owner while so held by him; and as to other lands allotted such lands were made inalienable for five years after issuance of the patents. The act of allotment provided that if any person whose name appeared upon the roll should die subsequent to September 1, 1902, and before receiving his allotment, the lands to which such person would have been entitled if living should be allotted in his name and (with his proportionate share of other tribal property) descend to his heirs according to the laws of -Arkansas. These provisions were submitted by the terms of the allotment act to the Cherokee people, who by popular vote ratified and agreed to the same. The United States closed the transaction by the issuance of patents, and the several parties took possession of their property under certificates which vested the absolute title in the petitioners and those who with them, became the owners in severalty of the land.
*313 Furthermore, the act under which the conveyances were made provided that such conveyances when approved by the Secretary of the Interior should serve as a relinquishment to the grantee of all the right, title, and interest of the United States in and to the lands embraced in the patent. It appears that the conveyances were approved according to law (sec. 59). By the acceptance of'the patent every individual allottee was “ deemed to assent to the allotment and conveyance of all the lands of the tribe as provided in the allotment act and to relinquish all his right, title, and interest to the same, except in the proceeds of lands preserved from allotment.” (Sec. 60.)
At the time of the. passage of the allotment act every Cherokee had been made a citizen entitled to all such rights, privileges, and immunities, as other citizens of the United States.
By an act approved March 11, 1904 (33 -Stat., 65), the Secretary of the.Interior was authorized to grant rights of way for the operation and maintenance of pipe lines for oil and gas through the allotted lands of the petitioners for twenty years, and at the end of that period to extend the right to maintain such pipe lines for another period of twenty years. .By another act, approved April 26, 1906 (34 Stat., 137), Congress attempted to impose further restrictions by Forbidding any full-blood Cherokee to alienate, sell, or-encumber any of the lands allotted to him for a period of twenty-five years from that date. Full bloods were given the privilege of leasing lands other than homesteads for inore than one year, but only under government rules and regulations. 'Leases and rental contracts (except for agricultural purposes) of lands other than homesteads were to be ineffective without the approval of the Secretary of the Interior; and adult heirs of any deceased Cherokee whose selection has been made could convey lands inherited only when approved by the Secretary.
There is really nothing new to be said outside of the adjudicated cases and their proper relation to and bearing upon the issues. But with fixed ideas as to the meaning of a grant, and because no case (out of at least 100 discussed) has been cited which sustains the proposition that land once *314 granted can be seized and controlled by the Government except in the exercise of the right of eminent domain, I am unable to accept the Government’s contention that the acts of Congress which, attempt to do so are valid.
It is not meant to say that the act conferring citizenship upon the complainants either altered or affected the conditions which accompanied the original grant. But when the land was granted the character of the title, allotted to the complainants and other full bloods was the same as if allotted to other citizens. The title of the one became as unqualified as the title of the other, and any attempt to differentiate between the fee so held can only be sustained upon the theory that the Indian can never acquire such a right to land as the Government is bound to respect.
Nor am I alone in this view, inasmuch as some of the ablest members of the United States Senate officially declared to Congress that the legislation known as the McCumber amendment was not valid, and a report to that effect was promptly acted upon by the same Congress that enacted a part of the legislation (which forms the subject-matter of the complaint here) by the passage of the act of our jurisdiction.
Preliminary to any discussion of the. merits, the majority of the court seem to have made objectionable findings, as I view them; and, though probably not intended to «prejudice petitioners, some of them are calculated to mislead.
None of them are necessary, because the courts must take judicial notice of the only essential fact necessary to be considered — that allotments to land and other valuable rights were conferred by a law specifically enacted to carry out the treaties of the United States with the Cherokees, which those people accepted by complying with the conditions fixed for title to vest and which, the United States ratified by putting the parties in possession under the patents of the Government. The attempt to set aside settled titles thus acquired is in violation of what the Supreme Court declared in Choctaw Nation (119 U. S., 29) and again in U. S. v. Old Settlers (148 U. S., 473), that—
“ Where, in professed pursuance of treaties, statutes have conferred valuable benefits upon Indians, which the latter *315 have accepted, they partake of the nature of agreements— the acceptance of the benefit, coupled with the condition, implying an assent on the part of the recipient to the condition.”
The fourteenth finding of the court alleges that the full bloods “ in the main ” are in favor of the extension of the period of restriction upon alienation or incumbrance of the lands and the supervision of governmental authority over leasing as well as supervision of the sale of the inherited lands. Apparently, then, this litigation is a continuation of the local controversy existing between the headmen of the Cherokees and other allottees, who, having possessed themselves of their property, naturally want to make use of it.
But these differences were concluded by the allotment act when ratified, and the Supreme Court recognized the force of the popular approval given to the act of July 1, 1902 (which made the allotments), by saying through Mr. Chief Justice Fuller in the Cherokee Intermarriage Cases (203 U. S., 93), that the majority of the natives voted against the acceptance. Nevertheless, the court affirmed the cases and closed the controversy with the statement that the allotments then being apportioned were according to the terms of the act which provided for them.
This disposes of the mere matter of what some of the full bloods want, as the allotment scheme has accomplished by law that which the wishes of some of the individuals to the agreement can not now influence. The partisan statements of the few individuals who have undertaken to testify should no more influence the action of the court on the constitutional question than the report of the Senate committee on the same subject (predicated upon two volumes of printed testimony) to the effect that the later legislation was unwise and injurious to the Cherokees.
“ While it is ordinarily true,” said the Supreme Court, “ that this court takes notice of only such facts as are found by the court below, it may take notice of matters of common observation, of statutes, records or public documents, or other similar matters of judicial cognizance.” (170 U. S., 32.) As the judicial power is strictly limited to the determination of the power of Congress to interfere, no testimony should or can be considered.
*316 The lands in controversy, like the neutral lands in Holden v. Joy (17 Wall., 211), were lands conveyed immediately and directly from the United States to the Cherokee Nation under the treaty of 1835. (7 Stat., 479.) Assurances were given to the Cherokee Nation that such lands would be conveyed to them “ in fee simple.” When the Cherokee constitution was adopted, the title to the common property, passed from the communal owners and became vested in the nation. (Whitmire's case, 30 C. Cls., 154; Eastern Cherokees v. United States, 40 ibid., 252; 202 U. S., 101.) All these lands were conveyed by patent in execution of the stipulations contained in several treaties — those of May 6, 1828, February 14, 1833, and December 29, 1835 — which granted the lands unto the Cherokee Nation, “ to have and to hold the same, together with all the rights, privileges, and appurtenances belonging unto the said Cherokee Nation, forever.” By article 4 of the treaty of 1846 it was agreed oh the part of the United States that all these lands “ shall be and remain the common property of the whole Cherokee people; ” and the Cherokee constitution (1839) provided that “ the lands of the Cherokee Nation shall remain common property.” Another treaty in 1866 resulted. Article 1, amending that treaty, repeated the declarations of previous treaties that the lands of the Cherokee Nation should remain common property, but also carried a provision that such lands should remain common property “ until the national council shall request a survey and allotment of the same in accordance with the provisions of article 20 of the treaty of July 19, 1866.” In Red Bird et al., Citizens of the Cherokee Nation by Blood, v. United States (203 U. S., 81) the Supreme Court recognized the completeness of the agreement in redemption of treaty promises, and with the issuance of the patents the scheme was carried out according to that decision.
Especially does it seem unnecessary to attempt to arraign the motives and conduct of a whole people, whose efforts to develop a new country have led to criticism of purchasers and lessees as designing men. If it be true that many of the full-bloods were induced to make contracts to sell or encumber their allottments, in violation of the terms of the *317 act of July 1, 1902, contingent upon the delivery of valid titles, those transactions do not concern this controversy, and the courts of Oklahoma are open to the grantors to set aside such contracts.
Many o.f the suits relate to the purchase of fractions of land reserved for town sites. Finding sixteen relates in part to these, and to transactions involving personal transfers under the act of 1902 for considerations not the subject of complaint and proper considerations which the grantors as well as the grantees supposed they had a right to give and receive. This right to buy and sell despite the act of 1906 — which is the subject of the complaint — is the thing in issue; not that the Indian is yet a child unable to help himself, needing forty more years of segregation from his white brother, to be left standing in the path of progress, and unfit to be absorbed into the habits and industrial life of the people among whom his lot is cast as a citizen.
Passing to the consideration of the real issue which according to the requirements of the jurisdictional act the court must consider, the Government’s contention is: (1) That the acts of the Government authorized to be exercised by the subsequent legislation of April 26, 1906, do not amount to a taking of the property. The court adopts this contention, but it seems to me to beg the question.
Any interference which destroys the market value of an owner’s individual property is the equivalent of a taking.
The inheritances provided for in the allotment act of July 1, 1902, had taken effect and fixed rights not only for those authorized to inherit, but also accomplished results for those intervening as purchasers or lessees within the limitations of the act which gave the allotments. The efforts of the Government now to control the land beyond the terms first fixed constitute the imposition of such penalties upon the present allottees in the use of their property as practically to, convert the fee derived by them under the terms of the grant into a life estate — with limitations upon the use so serious in character as to even lessen the value of the life estate itself. These efforts attempt to surrender to the lawmaking power the right of continued interference not only as such interposition may affect the living generation, but future generations of Indians as well, in the control and *318 enjoyment of private property held by as good a title as can be conferred by law.
“ Some things lie too deep in the common sense and common honesty of mankind to require argument or authority to support them.”
So said the Supreme Court. Fixed rules which obtain everywhere for the protection of private property are in this class and apply to Indians in possession under a lawful grant as much as to others holding by a patent from the Government, regardless of citizenship.
The right claimed for the Government to grant rights of way for the operation and maintenance of pipe lines, oil and gas, through the allotted lands for twenty years and at the end of that period to extend the right to maintain such pipe lines for another period of twenty years would seem to any holder of land to be a taking of his property. The right to lease lands held in fee simple without governmental supervision and to grant rights of way for pipe lines to public-service corporations and others and directly receive the revenues arising therefrom is as much the individual right of the Indian as the right of any other citizen of the United States. If Congress can constitutionally provide for the interference indicated by its later legislation, they may equally provide other and different methods for the disposition of the interests involved, and especially of those parties holding lands by inheritance. The compensation to be paid the al-lottees whose lands are attempted to be made subject to the easement indicated and provided to be fixed and collected by the Secretary of the Interior is a direct taking, even though the legislation is assumed to be for the benefit of those possessed of the allotments.
The grant of rights of way over the allotted lands is a violation of constitutional provisions.
Whether the pipe-line companies to which the Secretary of the Interior is attempting to grant rights of way under the later legislation are public corporations need not be considered. But independent of the character of these corporations to whom rights of way are proposed to be granted, it does not seem proper for any government officer to fix the compensation. Inasmuch as the Secretary of the Interior is *319 given that right by the legislation which forms the subject-matter of the complaint, it will be noted that the privilege of a trial by jury is denied, thereby burdening, the owner of the estate with an improper easement and consequently infringing the prohibition against the taking of private property without due process of law. The exercise of governmental authority under the circumstances also means the taking for public use of property without adequate compensation. In its last analysis the exercise of such governmental authority means that private property is authorized to be taken for private use.
Again, section 19 of the act of April 26, 1906, makes all lands upon which restrictions are removed subject to taxation. This is in violation of the special privilege conferred by section 13 of the allotment act of July 1, 1902, exempting homestead allotments from taxation so long as such homesteads should be held by-the allottees. This exemption from taxation was and is a valuable property right which legislation can not destroy; and the attempt to destroy this right is a taking of property in the constitutional sense. For the reasons stated and because property once lawfully acquired by anyone can not be so interfered with as to destroy or lessen any of the rights of that property in the hands of the owner, there was such a taking as the Constitution forbids.
It is next contended by the Government (2) that the legislation subsequent to the act of July 1, 1902, operated to continue the tribal government of the Cherokee Nation and the control by Congress of the property of the individual Cherokee, despite the allotment act which surrendered control of such land as was conveyed in fee simple to the individual members of the tribe. But the conclusion of the court— that the issuance of allotment certificates and conveyances to petitioners and other individual Cherokees vested in them the fee-simple title to the lands respectively — though correct, is inconsistent with the theory that the Government may destroy its patents because the owners are Indians.
The rights involved in the defense of the exclusive use and control of land by persons properly in possession as owners under the Government’s patents are not such rights as come within the category of “ technicalities,” but are vested rights, *320 “The enjoyment, present.or prospective, by some particular person or persons in property as of present interest.” (Pearsall v. R. R. Co., 161 U. S., 646; Cooley’s Constitutional Lim., 332.)
It was the early English law that a vested right was “ an immediate right of present or future enjoyment.” (Fearne’s Contingent Rem.) The right of property consists in the free use, enjoyment, and disposal of all the acquisition without any control of diminution save only by the laws of the land. (1 Blacks., 138.)
Where land is granted the legislative power is incompetent to annul the grant and give the land to another. Such a law is void. (Fletcher v. Peck, 6 Cr., 87.) A government is never presumed to grant the same land twice. (7 J. R., 8.) A grant by act of Parliament which conveys a title good against the King takes away no right of property from any other; though it contains no saving clause, it passes no other right than that of the public although the grant is general of the land. (1 C. O., 274, b; 1 Bent., 176; 5 J. R., 263.) In Arredondo’s case (6 Pet., 609) the principle is reaffirmed that where land is once granted the legislative power is incompetent-to annul the grant. A State can not impose a tax on land granted with an exemption from taxation (New Jersey v. Wilson, 7 Cr., 164), nor take away a corporate franchise (Dartmouth College v. Woodward, 4 Wheat., 518). Where a second patent has issued to land such second patent would be void because of the previous grant. (See Easton v. Salisbury, 21 How., 428.) Where a certificate shows reservation under a treaty and the action of the Indian in settling upon it the production of a certificate to that effect from the proper officer makes the land reserved and any subsequent patent becomes void. (Polk’s Lessee v. Wendell, 9 Cr., 87; Bagnell v. Broderick, 13 Pet., 436.) Allotment certificates, like certification of lists of land under special acts, convey a title as complete as patents. (Barney v. Dolph, 97 U. S., 652; Frasher v. O’Connor, 115 U. S., 102; Noble v. Union River, 147 U. S., 165.)
The inheritances provided for by this allotment act had taken effect, and, becoming effective, accomplished precisely that which any settlement could effect under any other kind *321 of lawful agreement. Accordingly the right conferred by means of the inheritance of the .lands actually allotted became as much a vested right in the person of the heir as the patent of the Government carried the vested right to the original allottee, unless the Government could confer the fee and take it away because the beneficiaries were Indians.
But, said Chief Justice Marshall, this is a government of laws and not of men; and when the title vested in the Indian, either by direct allotment or by succession, the recipients were supposed to be as much’•within the protection of the law as others. The title could not vest and yet be subject to the control of the grantor. If it could, there was no investiture. This court is in entire harmony, however, that the title did vest. When it did, there was nothing left for new legislation to operate upon as to the lands which had passed out of the control of the Government. As well might it be said if money had been distributed and annuities had been paid that subsequent legislation might provide for recovery as to say that a supplemental enactment could operate upon the title of land given absolutely to the individual.
Words of present grant excepted, the Supreme Court has been uniform in the holding that every patent passed a perfect and consummate title. (Wilcox v. Jackson, 13 Pet., 498.)
The whole question comes back to the proposition whether the United States, never having had a title of their own and having lost administrative control by carrying out its several treaty obligations, can now reestablish the relation of guardian and ward formerly existing between the Government and those receiving the allotments after the relation had been severed as to the property conveyed.
If “ unlettered people ” understood that their treaties meant what all others knew they meant, the relation of guardian and ward ceased when the treaties were executed; and under the rule declared in Worcester v. Georgia (6 Pet., 582) the treaties accomplished under the law with the consent of the tribe as well as the Government what both parties intended.
The theory of the majority is, citing Lone Wolf v. Hitchcock (187 U. S., 553), and the Matter of Heff (197 U. S., 488), that plenary authority over the subject-matter con *322 tinues political, not subject to be controlled by judicial determination. The difficulty with the application of this proposition is the difference between the titles and the relations of the parties with respect to the tenures of the lands. The allottees here are neither communal owners nor is the property any longer common. Congress can by no apt re-assume control upon the theory, that the property is of a community character, or that the tribe has any ownership in common of the allotted property. In Lone Wolf v. Hitchcock, ante, the Supreme Court planted further political authority squarely upon the proposition that the Indians there had not been emancipated from the control and protection of the Government in so far as that control and protection related to the tribal lands of the parties concerned, citing Choctaw Nation v. United States (119 U. S., 1), and Stephens v. Cherokee Nation (174 Ibid., 445). Mr. Justice White expressly put the decision upon Cherokee Nation v. Hitchcock (187 U. S., 294), “ where it was held that full administrative power was possessed by Congress over Indian tribal property.” The court presumed for all four cases that Congress acted in good faith because the property remained communal and common, which meant unallotted lands. No such presumption can be applied in the case at bar because no refinement of language can make any property, where the title has been received as a matter of individual right, a tribal interest in that property. It became individual and ceased to be tribal for any purpose.
Possibly treaties may properly be broken and new laws unsettling fixed rights may be desirable for the full bloods indefinitely, if each and all of them individually indicated consent.
But no request of the Cherokee government could be the basis of further legislative control, because the tribal government had only been retained for the purpose of distributing lands not allotted in severalty to those designated to receive the same. The proposition that governments of any kind can interfere here means for people supposed to be more civilized than any other class of Indians a kind of guardianship more arbitrary than anything ever yet declared.
*323 The Supreme Court has never acquiesced in any such proposition. In New York Indians v. United States (170 U. S., 23) the court rejected a proviso by saying: “ There is something, too, which shocks the Conscience in the idea that a treaty can be put forth as embodying the terms of arrangement with * * * an Indian tribe ” by the assertion of a material provision unknown to one of the contracting parties and kept in the background to be used by the other only when exigencies demanded.
In Jones v. Meehan (175 U. S., 1) an allotment had been made not to a citizen of the United States, but to an Indian. It was held that the title to the property could not be interfered with by any subsequent act of Congress or by the executive departments. The series of decisions reviewed by the court discloses that as the reserve sections became individual property the reservation became the “ equivalent to a present grant of a complete title in fee simple;” alienable by the grantee at pleasure unless by treaty or contemporaneous act Congress restricted alienation.
In Garfield v. United States ex rel. Goldsby (211 U. S., 249) the court said that “ it has always been recognized that one who has acquired rights by an administrative or judicial proceeding can not be deprived of them without notice and an opportunity to be heard ” — thus defining the meaning and extent of constitutional practice against action without due process of law.
In Wallace v. Adams (204 U. S., 415) the principle was affirmed that an allotment certificate when issued like a patent to land was dual in its effect because it was an adjudication of the special tribunal empowered to decide that the party to whom it was issued became entitled to the land and was a conveyance of the right.
In Wiggan v. Connolly (163 U. S., 56) the court dealt with a contingent estate; the property was plainly tribal and not held in fee simple by the individual.
Preceding the act conferring citizenship upon the Cherokees (31 Stat., 1447), doubts were stated by a committee report to Congress as to whether the parties could perform any of the usual personal business engagements' daily taking-place on .a vast scale where they lived without a technical *324 violation of the laws requiring supervision of the Cherokees. A reason thus appeared for making these people citizens. It was one of the steps taken to discharge the recipients from the supervision of the agencies of the General Government. In the Matter of IIeff (197 U. S., 508) the Supreme Court held that Indians receiving the privileges of citizenship were outside of all police regulations on the part of the Congress without the consent of the individual Indian and the State. The court said that the logic of the argument to the contrary implied that the United States could never release itself from the obligation of guardianship; that the reach to which the argument went for the assumption of the rights of guardianship which it has once abandoned demonstrated its unsoundness.
For the reason that political rights (protected so carefully for the Indian-made citizen in Heff’s case) are of no greater importance and rise no higher than the. property rights of the Indian citizen where, when the grant of the property right took effect, the Government abandoned its guardianship over the Indian — certainly to the extent of the land granted and put in his possession by the Government — the legislation which forms the subject-matter of this complaint does not seem to me to be a valid exercise of the legislative power. If it be valid legislation, there is no limit to the exercise of political authority over an Indian grant no matter how ancient or how long held by the Indian beneficiary. And certainly there is a time when political control ceases to be plenary and lawful and can become arbitrary and unconstitutional.