GOODRUM et al. v. BUFFALO.

(Circuit Court of Appeals, Eighth Circuit. July 23, 1908.)

No. 2,746.

1. INDIANS—ALIENABILITY OF ALLOTTED LANDS OF THE QUAPAW INDIANS.

Under Act Cong. March 2, 1895, c. 188 (28 Stat. 907), and patents issued thereunder, declaring the land inalienable for 25 years thereafter, *held*, that the disability to convey runs with the land, and disqualifies the heir, as well as the immediate allottee, to convey within the prescribed period.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, § 37.]

2. SAME—RULES OF THE COMMON LAW INAPPLICABLE.

The general government, exercising a tutelary supervision over such Indians, as wards of the nation, it is *held*, has the right to attach any condition or qualification it sees fit to grants of the reservation lands of the tribe in severalty. So, notwithstanding such grantees may be citizens of the United States, and notwithstanding the patent may run to the allottee and his heirs, the common-law rules respecting a limitation upon alienation, being inconsistent with the prior estate in fee granted, would not extend beyond the natural life of the immediate allottee, as also the doctrines of estoppel, have no application to the instance of said patent.

3. SUBMISSION OF CONTROVERSY—JUDGMENT—RES ADJUDICATA.

Notwithstanding the general rule that a judgment between parties sui juris, where the court has jurisdiction over the subject-matter and the parties, is conclusive of every question of fact and law in contestation, and cannot be attacked in a collateral proceeding, a judgment rendered by the United States Court in the Indian Territory, under a stipulation between a Quapaw Indian and a white man, submitting, under the provisions of local law, for decision the question of the power of such Indian allottee, or his heir, to convey his or her allotment within the 25-year period of limitation under Act Cong. March 2, 1895, c. 188, 28 Stat. 907, adjudging the validity of such conveyance, *held* to be invalid, when interposed to defeat the action of ejectment by the Indian heir against the prevailing party in such proceeding, for the following reasons: (1) Because the stipulation of submission, in the affidavit thereto, omitted a material fact, which is jurisdictional in character; (2) because the stipulation and the judgment do not describe the land in suit; (3) because, as to the power of alienation of such land, the Indian allottee and his or her heir, within the limitation period of 25 years, was not a person sui juris, capable of assenting to such submission; and (4) because the United States Court in the Indian Territory, being itself a creature of Congress, with limited jurisdiction, was not invested with jurisdiction to extend by mere decretal order a power of alienation over such lands denied by another act of Congress to such Indian.

(Syllabus by the Court.)

In Error to the United States Court of Appeals in the Indian Territory.

For opinion of the court below, see 104 S. W. 942. See, also, 104 S. W. 944.

This is an action of ejectment, instituted by the defendant in error, Arthur Buffalo, a minor, by J. F. Robinson, his guardian, against the plaintiffs in error, for the recovery of certain lands in the Quapaw reservation in the Indian Territory. The title of the defendant in error was derived as follows: On September 26, 1896, a patent was issued by the United States to John Medicine, a Quapaw, as an allottee of the reservation lands of said tribe of Indians. Said John Medicine died in 1896, leaving as his sole surviving heirs a daughter by the name of Ollie and a son named James Medicine. There-

162 F.—52

after the said Ollie Medicine died intestate in 1901, leaving as her sole heir the defendant in error, Arthur Buffalo. In April, 1903, said James Medicine died, leaving the defendant in error as his sole heir. The answer of the defendants, while in effect admitting that Arthur Buffalo was such surviving heir at law, set up a deed of conveyance from said Ollie, made subsequent to the death of said patentee, John Medicine, to the plaintiff in error, C. D. Goodrum, under which he claims. The answer further pleaded that in October, 1899, there was submitted an agreed statement of facts, entered into between said Ollie and the plaintiff in error, C. D. Goodrum, to the United States Court at Vinita, Ind. T., which recited that said Ollie had sold to said Goodrum all her right, title, and interest to the land in question; that there was then a balance of $52.25 of the purchase money due and unpaid, and that because of the fact that by the patent to said John Medicine and the act of Congress under which it was issued the said lands were inalienable by the patentee for a period of 25 years there was a question of law as to whether the said Ollie was competent to sell or dispose of said property so inherited, and therefore it was submitted to said court to determine the validity of said sale to said Goodrum, and whether or not he should pay to said Ollie the balance of the purchase money; that under said submission said United States Court at Vinita adjudged that the sale so made by said Ollie to the plaintiff in error was valid, and directed that upon payment of the balance of said purchase money she should execute to the said Goodrum a deed to said land, which had accordingly been done. The answer then set up title to the interest of said James Medicine in said lands, acquired in the same manner and under a like judgment of the said United States Court at Wagoner, Ind. T., under a like submission on stipulation, and under a deed made by him in pursuance of the judgment therein. The judgment below was for the defendant in error, which was affirmed by the Court of Appeals in the Indian Territory, to reverse which this writ of error is prosecuted.

Dennis H. Wilson, Preston S. Davis, Luman F. Parker, Jr., and Orion L. Rider, for plaintiffs in error.

W. H. Kornegay and Cooter, Thompson & Thompson, for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge (after stating the facts as above). The questions presented for decision are of great public importance, and are such as to demand definite determination. The history of the relation of the United States government toward the reservation lands of the Indians, both as to their tribal and individual status and rights, shows that because of the limited qualification of the Indians to exerercise the functions of self-government and to appreciate and preserve their individual property interests, so as to become self-supporting and cease to be a charge and burden to the national government, the Indians have ever been regarded and treated as the "wards of the nation." Throughout the dealings with them, both by treaties and legislative enactments, the general government has, from a sense of justice to the Indians, as well as from a conception of sound public policy, found it to be wise and obligatory to safeguard these dependent subjects in their property rights against the mastery and craft of the white man. So long as their reservations remained communistic, the property of the tribe, as such, was not jeopardized by attempted acquisition by outsiders; but when their tribal relations were disrupted, at the solicitation of the government commissioners, and it was proposed to allot

the lands in severalty among those entitled thereto, Congress was confronted with a grave responsibility and duty it could not in honor shirk. The problem was experimental. The underlying policy in this rearrangement of treaty stipulations with the Indians was to stimulate in them a spirit of self-assertion and reliance, by inculcating the habit of industry and self-support. Feeling a strong misgiving as to their capacity and inclination to hold their allotments, to establish and maintain the family home, to soon conquer their inherent indolence and wastefulness, and apprehensive of their lack of virtue and moral courage to withstand temptation to part with their inheritance for "a mess of pottage," the whole legislation of Congress touching the allotment of Indian lands expresses on its face this feeling of distrust and a determined policy to put the allottees on probation during this experimental period. Accordingly, while authorizing the allotments in severalty, Congress conceded the lands, with a firm cable attached to hold them to the exclusive use and possession of the Indians, without qualification restricting the power to divest themselves of the use and title until after the fixed period.

The usual pertinent provision found in the acts of Congress was to retain the title in the government in trust for the allottees for a period of 25 years, after which the Secretary of the Interior was authorized to issue to them or their heirs a patent in fee to the lands. See Act Feb. 8, 1887, c. 119, 24 Stat. 388. In the case of the Quapaw Indians, who manifested reluctance to disrupt their tribal relations and to relinquish their reservation to the government, with a view to allotment in severalty, the National Council assented to the proposal March 23, 1893, which was ratified and approved by Act Cong. March 2, 1895, c. 188, 28 Stat. 907, which provides that:

"The Secretary of the Interior is hereby authorized to issue patents to said allottees in accordance therewith: provided, that said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents."

This was in accordance with the settled policy of the government of continuing these wards of the nation in a state of comparative tutelage for the further period of 25 years after such allotment as essential to their education and qualification to intelligently and safely exercise the jus disponendi over their lands, with the exception that under the supervision and approval of the Secretary of the Interior short-term leases might be made. As evidence of the fact of the continued wardship of the Quapaw Indians and their dependence upon the national government for guardianship and tutelage, Congress each year makes appropriations out of the public treasury for their education, blacksmith and assistants, and tools, iron, and steel for blacksmith shops.

The form of the patent granted in the case under consideration recited that the United States—

"does give and grant unto the said [patentee], and to [his or her] heirs, the said tract above described, but with the stipulation and limitation, contained in the aforesaid act, that the land embraced in this patent shall be inalienable for the period of twenty-five years from and after the date hereof, to have and to hold the same, together with all the rights, privileges, and im-

munities and appurtenances of whatsoever nature thereunto belonging, unto the said [patentee], and to [his or her] heirs, forever, provided as aforesaid that said tract shall be inalienable for the said period of twenty-five years."

The language of the act and the patent could not have been more exact and clear to express the purpose and policy of the government to deny the power and right of these allottees to dispose of the lands in any manner until after the stated period of 25 years. As the greater includes the lesser, no contract, agreement, or obligation in form entered into by the allottee or his heirs within the limitation period could possibly have the effect to operate as, or result in, a transfer of the title to these lands to a third party. There is but one opinion among the courts, with the single exception of the ruling in said United States Court of the Indian Territory, as to the construction of such acts of Congress and patents made thereunder, and that is that any and all schemes and devices resorted to for the purpose of acquiring title to the Indian allotments during the period of such limitation are abortive; and this for the palpable reason that it is a period of absolute disability on the part of the Indian to alienate his lands.

In Laughton v. Nadeau (C. C.) 75 Fed. 789, there was an attempt to obtain title to Indian land through an administration proceeding in the probate court. It was held that when the lands are allotted to members of the tribe, under the supervision and care of the government, the allottee could not be deprived of said land by any such proceeding; that the parties dealing with the Indians must take notice of the public treaties and acts of Congress, and may not obtain such lands as bona fide purchasers, against the restriction on alienation, even where such restriction is not expressed on the face of the patent.

In Taylor v. Brown, 5 Dak. 335, 40 N. W. 525, the Supreme Court of Dakota held that where a patent was issued to Indians under Act March 3, 1875, c. 132, 18 Stat. 420, providing that the land so acquired shall not be subject to alienation or incumbrance for five years after the patent, a deed executed by the patentee within the period, though the patent on its face was an absolute conveyance and did not show that the patentee was an Indian, was absolutely void, and that no adverse possession could be predicated of a deed executed by the patentee within the period, so as to avoid a deed made by the patentee to another after the five years had elapsed.

In Sheldon v. Donohoe, 40 Kan. 346, 19 Pac. 901, the Supreme Court of Kansas held that a white man, who had been adopted as a member of an Indian tribe, who made a deed purporting to convey to another white man a tract of land, which under the treaty could not be alienated except to the United States or some member of the tribe, could not convey title to the grantee; so that, although the vendee had thus come into possession, he could be evicted, because the deed was absolutely void, the purchaser could not claim any right in the land in violation of the treaty, nor could he indirectly build up an adverse possession, estoppel, or limitation, as the transaction was void ab initio.

In Beck v. Flournoy Live Stock & Real Estate Company, 65 Fed. 30, 12 C. C. A. 497, this court made no uncertain pronouncement upon this question. The real estate company undertook to acquire posses-

sion by lease of large tracts of land belonging to the Winnebago Indians in the state of Nebraska. When the government ordered the agent to put the cattle companies off the lands the latter brought a bill of injunction to restrain him. It was ruled that in view of the treaties and acts of Congress these leases were void. The patents issued to the allottees referred to the act of Congress under which they were issued, and the granting clause, which contained the limitation, "without right of alienation as stipulated in the act of Congress aforesaid." After discussing the various provisions of the statute, Judge Thayer expressed the view that it was manifest from an inspection of the various acts of Congress it did not intend to authorize the Indians to whom the allotments had been made in severalty to lease or otherwise dispose of the allotted lands; that the limitation upon the power of alienation was made to protect the Indians from the greed and superior intelligence of the white man. He then said:

"Congress well knew that if these wards of the nation were placed in possession of real estate, and were given capacity to sell or lease the same, or to make contracts with white men with reference thereto, they would soon be deprived of their several holdings, and that, instead of adopting the customs and habits of civilized life and becoming self-supporting, they would speedily waste their substance and very likely become paupers. The motive that actuated the lawmaker in depriving the Indians of the power of alienation is so obvious, and the language of the statute in that behalf is so plain, as to leave no room for doubt that Congress intended to put it beyond the power of white men to secure any interest whatsoever in lands situated within Indian reservations that might be allotted to Indians."

In Wiggan v. Conolly, 163 U. S. 56, 62, 16 Sup. Ct. 914, 916, 41 L. Ed. 69, Mr. Justice Brewer, speaking to a case growing out of the allotment to the Ottawa Indians in Kansas, said:

"This treaty of 1867 introduced a new limitation upon the inalienability of lands patented to a minor allottee; that is, the limit of minority. And such limit must be applied to sales voluntary and involuntary, and cut off the right of a guardian to dispose of the estate. The fact that the patent to this allottee had already been issued did not abridge the right of the United States to add, with the consent of the tribe, a new limitation to the power of the individual Indian in respect to alienation. The land and the allottee were both still under the charge and care of the nation and the tribe, and they could agree for still further protection, a protection which no individual was at liberty to challenge."

Counsel for plaintiffs in error undertake to meet the force of these authorities with the contention that the limitation upon alienation is inconsistent with the estate in fee conveyed by the grant, and that on principles of the common law it should be limited in its operation to the life of the immediate patentee, and therefore upon his death his heirs had the right of disposal without restraint. We make no contention that at common law it was against the policy of the law to allow restraints to be imposed upon the alienation of an estate in fee. In our judgment, this and kindred rules of the common law respecting the title and the alienability of lands have no applicability to this case. In Beck v. Flournoy Live Stock & Real Estate Co., supra, the contention was made that, because the act of Congress had conferred the right of citizenship upon the Indian allottees, power to dispose of the allotted lands went as an incident of citizenship; that Congress could

not transform the Indians into citizens without, by intendment, conferring upon them the power to sell and dispose of their property as persons sui juris. But the court said:

"We know of no reason, nor has any been suggested, why it was not competent for Congress to declare that these Indians should be deemed citizens of the United States, and entitled to the rights, privileges, and immunities of citizens, while it retained for the time being, the title to certain lands in trust for their benefit, and withheld from them for a certain period the power to sell, lease, or otherwise dispose of their interest in such lands. It is competent for a private donor, by deed or other conveyance, to create an estate of that character; that is to say, it is competent for a private person to make a conveyance of real estate, and to withhold from the donee for a season the power to sell or otherwise dispose of it. And we can conceive of no sufficient reason why the United States, in the exercise of its sovereign power, should be denied the right to impose similar limitations, especially when it is dealing with a dependent race like the Indians, who have always been regarded as the wards of the government. Citizenship does not carry with it the right on the part of the citizen to dispose of land which he may own in any way that he sees fit, without reference to the character of the title by which it is held. The right to sell property is not derived from, and is not dependent upon, citizenship; neither does it detract in the slightest degree from the dignity or value of citizenship that a person is not possessed of an estate, or, if possessed of an estate, that he is deprived for the time being of the right to alienate it."

In Jackson v. Thompson, 38 Wash. 282, 80 Pac. 454, it was held by the Supreme Court of Washington that a deed from the United States to an Indian, forbidding alienation, deprived the grantee of the power to dispose of the property by will. The patent conveyed the land to the grantee and his heirs, with the stipulation, contained in the sixth article of the treaty, that said tract shall not be alienated or leased for a longer term than two years, and shall be exempt from levy, sale or forfeiture, to continue in force until certain conditions. The patent contained the usual habendum clause. The contention was there made that the language of the patent was conclusive, and that the limitation upon alienation continued in force only during the life of the patentee. It was argued there, as here, that the limitation was purely personal and did not run with the land; that the granting clause, standing alone, conveyed a fee-simple estate, which was strengthened by the habendum clause, "to have and to hold the said tract of land unto the said John Puyallup, and to his heirs, forever." It was further contended, as here, that the restriction in the patent was void, because it was repugnant to the grant of an absolute fee. The court said:

"The Indians are wards of the government. These arrangements and provisions are in their interest and by their consent, as indicated in the solemn treaties executed. The government, from the necessities of the case, in consideration of the inexperience of the Indians, was compelled to insert these provisions in deeds issued to them to prevent them from becoming the prey of sharpers and speculators, who would for an insufficient consideration obtain their lands; the ultimate result being that the Indians would become pensioners of the government, and the mutual interests of the Indians and the government demanded some such regulation."

The specious argument was there made, against continued restriction, that as the heirs of the Indians increased the restrictions would become burdensome and impracticable. Of this the court said:

"This is a condition which is within the power of the general government to relieve whenever the necessity arises. There can be no question that under authority the word 'alienate' means, among other things, the power of disposition."

The discussion of this question by Judge Dick, in Smythe v. Henry (C. C.) 41 Fed. 705, is instructive as well as pertinent. The Legislature of North Carolina passed an act for the benefit of the Cherokee Chief Juneluska, the first section of which conferred upon him the rights and privileges of a citizen of the state. The second section authorized the Secretary of State to convey to him in fee simple the tract of land in question, with a limitation against alienation, except for the term of two years from time to time, with the right, however, to dispose of it by devise. This was held to be a donation act, and the limitation was intended to guard his inexperience in business matters against the craft of the white man and to protect him from temptation which might induce him to make an improvident disposition of his property. It was there insisted that the restriction imposed by the second section upon the right of alienation was inconsistent with the first section, conferring upon him the rights, privileges, and immunities of citizenship. The court held that, when the state conveyed the land for the purpose in question, it had the right to impose any restrictions it deemed proper upon the grant; that the statutory power of the Legislature was superior to the rules and usages of the common law; that the presumptions and rules of law which usually apply to grants, such as forfeiture, reverter, estoppel, and the like, were suspended. The court said:

"The power of alienation regulated by statute must be strictly complied with, so that the policy and object of the statute may not be defeated."

So that, although this Indian attempted to convey the land by deed and then accepted a lease back from his grantee, it was held that his possession was not that of the lessor, so as to put in operation the statute of limitations in favor of his grantee; that, the deed from him being void, his acceptance of the lease of the land did not prevent his descendants from disputing the title of his grantee.

The language of the statute under which the patent was issued to John Medicine is "that said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents." It is a limitation attached to and running with the land, in no wise dependent upon the life or death of the patentee. It was as much within the policy and purpose of the government to see that the heirs of the allottee, in case of his death, were protected against alienation of the land, as the allottee himself; otherwise, they might become a charge upon the public, and the beneficent policy of the government in bringing about the allotment of lands in severalty would be thwarted.

Not having full confidence in his ability to hold this land under his purchase from the heir of the allottee, Goodrum and his adviser evidently conceived the idea of resorting to a submission by stipulation to the United States Court in the Indian Territory, whereby the judgment or decree might be had in his favor, so that, if the Indian or his minor child might thereafter undertake to eject him or have his deed nullified, he could plead that judgment as an estoppel. The sub-

mission by stipulation to the United States Court in the Indian Territory was under the following provision of the statute of Arkansas, at the time in force in the territory:

"Parties to a question which might be the subject of a civil action may, without action, agree upon a case containing the facts upon which the controversy depends, and present a submission of the same to any court which would have jurisdiction if an action had been brought. But it must appear by affidavit that the controversy is real, and the proceedings in good faith, to determine the rights of the parties. The court shall thereupon hear and determine the case, and render judgment as if an action were pending."

As such proceeding, without suit, summons, or voluntary appearance of the defendant, without issue made by pleadings, was unknown to the common law, it must be conceded that its validity depends upon a strict compliance with the special statute conferring jurisdiction upon the court. The statute expressly provides that "it must appear by affidavit that the controversy is real, and the proceedings in good faith, to determine the rights of the parties." Therefore this affidavit is an essential, indispensable part of the submission, without which the jurisdiction of the court was not put into operation.

The statute of the state of Wisconsin contains the identical provision. In Town of Plainfield v. Village of Plainfield, 67 Wis. 525, 30 N. W. 674, Lyons, J., said:

"The required affidavit is essential to the jurisdiction of the court to render a valid judgment on the matter submitted. Without it the decision of the court is not a judgment, which can be enforced as a judgment in an action, or which may be appealed. At most it is a mere award, as in a common-law arbitration. This record contains no such affidavit, and it is conceded that none was made."

The court held that no appeal would lie from such decision, because the judgment was coram non judice. Therefore the suit was dismissed.

California has a like statute. In White v. Clark, 111 Cal. 164, 44 Pac. 164, both stipulators made affidavit:

"That the above and foregoing statement of the case, containing the facts above stated, is a real controversy, and the contention is in good faith to determine the rights of the parties."

The court held that the judgment was not the whole record, as it was not a part of the original submission, but relates to dates subsequent to that of the affidavit. It said:

"The affidavit annexed to the agreed case is insufficient to authorize the court to entertain the proceedings. Instead of showing that the controversy is real, its language is that the statement of the case is a real controversy; and, instead of stating that the proceedings are in good faith, it states that the contention is in good faith."

It was, therefore, held to be bad.

In Ellis v. Pacific Railroad, 51 Mo. 200, the court discussed the effect of a judgment condemning lands for the use of the railroad, where the validity of the judgment was brought in question in a collateral proceeding in the action of ejectment. Under the statute the party seeking to condemn was authorized to go into court when no agreement as to the taking of the land could be had with the owner.

The petition in the condemnation proceeding did not disclose on its face that the parties were unable to agree. Sherwood, J., said:

"In this statutory and summary proceeding, this legal coup de main, in derogation of common law and common right, the utmost strictness is required in order to give validity; and unless, upon the face of the proceeding had, it affirmatively appear that every essential prerequisite of the statute conferring the authority has been fully complied with, every step, from inception to termination, will be coram non judice. Under the statute above mentioned the refusal of the owner to relinquish is a jurisdictional fact, in the absence of which even a court of general jurisdiction would be powerless by judgment of condemnation to wrest property from its owner. And authorities are not wanting, either in point of numbers or respectability, which hold that quoad these summary proceedings, courts of general jurisdiction stand upon the same footing as those tribunals whose jurisdiction is special and limited. It follows as an inevitable sequence from these premises that the judgment of condemnation was utterly worthless and could be of no avail as a matter of defense"— citing Lind v. Clemens, 44 Mo. 540; Murtaugh v. City of St. Louis, Id. 479; Reitenbaugh v. Chester Val. R. R. Co., 21 Pa. St. 100.

Goodrum was the only party who made affidavit to the submission in question to the court, which was as follows:

"C. D. Goodrum, of lawful age, being duly sworn, on his oath says that he is one of the above-named parties, and that the proceeding is in good faith to determine the rights of the parties thereto."

It will be observed that there is an entire omission of the requirement of the statute that "it must appear by affidavit that the controversy is real." Waiving any discussion of the question as to whether or not under the language of the statute, "The parties to a question * * * may agree," etc., requires that both parties should make oath, the affidavit made by only one of the parties omits entirely one essential requirement—that the controversy is real. The very purpose of this requirement was to prevent feigned issues or moot questions from being submitted to the determination of the court, necessitating an appeal to the court to settle the controversy between real litigants. As the jurisdiction of the United States Court was wholly dependent upon the stipulated case submitted, counsel for plaintiffs in error recognized the fact that it was not sufficient merely to put in evidence the judgment of the court. They therefore presented the agreed stipulation and affidavit as essential to confer jurisdiction on the court. The absence of the required affidavit, as shown by the record, did not authorize the court to proceed to judgment at all.

There is another objection to the stipulation of submission to the United States Court upon which the judgment was predicated, and also to the judgment. The stipulation describes the land as located in township 24, range 29, and the judgment follows the same description; whereas the land sued for in this action is located in township 29, range 24. This variance, in so far as the plea of res adjudicata is concerned, justified the judgment of the United States Court appealed from in this case, notwithstanding this defect was overlooked by the respective counsel.

Aside from these criticisms, the proceeding was not effectual to create an estoppel by judgment, notwithstanding the well-recognized rule, contended for by counsel for plaintiffs in error, that judgments

of courts of record having jurisdiction over the subject-matter and the parties are binding on the parties and their privies in estate, and cannot be attacked in a collateral proceeding. The Indian who consented to the stipulation for submission to the judgment of the court for such purpose was not a person sui juris. The submission required, as the very basis of its recognition, the acquiescence and consent of the Indian thereto. The effect of the act of Congress, under which the patent was granted, was to deny to the Indian the exercise of any consent whereby the restriction upon the power of alienation could be removed. If the Indian could create no estoppel against himself or herself by deed of conveyance, how could he or she create an estoppel, by consenting to a judgment as the basis of an estoppel, effectual to alienate the land, in direct contravention of the act of Congress? The allottees of these lands, during the probationary period of 25 years, were under as much disability to alienate them by contract, or deed, or voluntary submission to a court, as if they had been under the disability of coverture or minority. The disability of the minor to do these things is imposed by the common law. The disability of these Indians is imposed by statute. It must, therefore, logically and necessarily follow that the record and judgment of a court, disclosing on their face that the disqualified Indian was entering into an agreement for submission of the question of his right to dispose of these lands, was in no wise different from such a proceeding participated in by a minor infant. It is a wholesome rule of law that a party may not accomplish by indirection that which he could not do directly. That which Goodrum undertook to do by stipulation with this Indian could not become the subject of a controversy to be submitted to the jurisdiction of the United States Court, so as to build a foundation to support the plea of res adjudicata. In White v. Clark, 111 Cal. 164, 44 Pac. 164, under a statute like that of Arkansas, providing for submission to the court, without pleading, of a matter in controversy between the parties, it was held that a mere statement that the party claimed said land as a homestead fell short of conferring upon him any interest in the land or right to question the title; that whether the party would have a right to enter the land as a homestead under the United States statutes or that the patent under which the defendant claimed title was void could not be the subject of a civil action in the courts of the state. This evidently was for the reason that as the homestead act confers the right upon the homesteader of occupancy, upon which no other party can be entitled to enter, and which cannot be conveyed by the homesteader during the period of improvement, it could not be the subject of a real controversy, in contemplation of the statute, and therefore any judgment predicated upon such a controversy could be of no value.

It is transparent on the face of the proceedings in the United States Court, resulting in the judgment relied upon by Goodrum as an estoppel, that it was not an honest proceeding. If Goodrum earnestly desired a judicial determination of the power of the Indian to convey the land in question, why did the parties content themselves with the conclusion of the United States Court? Naturally enough, they would have at least sought the judgment of the Appellate Court in the In-

dian Territory. Relying, as Goodrum's answer does, upon the deed executed to him by Ollie Medicine, made pursuant to said decree of the territorial court, the situation presents an anachronism, and an anomaly in law. The Congress, representing the sovereignty of the nation, created the estate, affixing to it the quality of inalienability for the period of 25 years. Without the creator's consent the grantee was without the power to convey. Where and how did the territorial court acquire such jurisdictional power? The court itself was but the creature of Congress. It was not invested with the power to confer upon this Indian authority to convey away her allotted lands which the sovereign government, creating the estate and the court, declares shall not be done for 25 years after allotment.

This conclusion is sustained, on principle, by the ruling in Bigelow v. Forrest, 9 Wall. 339, 19 L. Ed. 696. Under the confiscation act certain lands of French Forrest were condemned and sold; Bigelow becoming the purchaser in that proceeding. Upon the death of Forrest his son and heir brought suit to recover the lands, and made the contention that under the joint resolution of Congress, which declared that condemnation under the act should not work a forfeiture of the title of the offender beyond his natural life, the title of Bigelow terminated with the death of Forrest. It was contended there, as here, that the decree of the court confiscating the property in effect ordered all the estate of Forrest to be sold, including the fee, and that, although the decree was voidable, it was not void. That was a proceeding in rem, where the property was within the jurisdiction of the court, and where there was even authority to confiscate and sell; but it was held that the extent of the court's power was limited by statute. The court said:

"It is argued, however, on behalf of the plaintiff in error, that the decree of confiscation in the District Court of the United States is conclusive that the entire right, title, interest, and estate of French Forrest was condemned and ordered to be sold, and that, as his interest was a fee simple, that entire fee was confiscated and sold. Doubtless a decree of a court having jurisdiction to make the decree cannot be impeached collaterally; but under the act of Congress the District Court had no power to order a sale which should confer upon the purchaser rights outlasting the life of French Forrest. Had it done so, it would have transcended its jurisdiction."

The principle of this ruling was affirmed in Day v. Micou, 18 Wall. 156, 21 L. Ed. 860, and Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872.

It should be understood, once for all, that no scheme or device, however ingenious or plausible, concocted by any person, can avail to divest the Indians of the title to their allotted lands within the period of limitation prescribed by Congress.

The judgment of the United States Court of Appeals in the Indian Territory is therefore affirmed.