UNITED STATES v. DOWDEN et al.

(Circuit Court, E. D. Oklahoma.   September 25, 1911.)

No. 1,450.

1. INDIANS (§ 15*)—LANDS—RESTRICTIONS ON POWER OF ALIENATION.

The provision of the original treaty by which the tribal lands were vested in the Choctaw and Chickasaw Nations, making such lands inalienable without the consent of the United States, did not follow them after their allotment in severalty under the agreement approved July 1, 1902 (Act July 1, 1902, c. 1362, 32 Stat. 641), but whatever restrictions exist upon the power of the allottees to alienate must be found in such agreement or in subsequent legislation.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 37–41; Dec. Dig. § 15.*]

2. INDIANS (§ 15*)—LANDS—RESTRICTIONS ON ALIENATION—ALLOTMENTS TO DECEASED MEMBER OF TRIBE.

The restrictions imposed on the alienation of lands by Choctaw and Chickasaw allottees by the agreement of July 1, 1902 (Act July 1, 1902, c. 1362, 32 Stat. 642) §§ 15 and 16, which restrict the right to incumber, and provide that lands allotted to members of the tribes, other than homesteads, shall be alienable after issuance of patent one-fourth in acreage in one year, one-fourth in three years and the remainder in five years, apply to lands allotted in the name of a deceased member under section 22, title to which vests in his heirs, and an attempted conveyance by such heirs before the expiration of the time so fixed is void.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 37–41; Dec. Dig. § 15.*]

**3. INDIANS (§ 15\*)—LANDS—RESTRICTIONS ON ALIENATION BY ALLOTTEES.**

A citizen of the Choctaw or Chickasaw Nation by intermarriage, not an Indian, who was entitled to an allotment of land and received a certificate of allotment from the commission in due form, which under section 23 of the supplemental agreement ratified July 1, 1902 (Act July 1, 1902, c. 1362, 32 Stat. 644), is made conclusive evidence of the right to such allotment, took an equitable estate which was alienable at once and entitled the grantee to the issuance of a patent; all restrictions upon alienation by such class of allottees having been removed by Act April 21, 1904, c. 1402, 33 Stat. 189.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 37–44; Dec. Dig. § 15.\*]

**4. INDIANS (§ 13\*)—LANDS—SURRENDER OF ALLOTMENT.**

An Indian allottee, who has received a certificate of allotment and has made no valid conveyance of the land, may, before issuance of patent, by agreement with the officers of the Interior Department, surrender such certificate and receive a new allotment, and on cancellation of the certificate the lands covered again become unallotted lands of the tribe.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.\*]

**5. INDIANS (§ 27\*)—LANDS—SUIT BY UNITED STATES TO CANCEL CONVEYANCES.**

Where the Interior Department under the provisions of law has made a reservation of tribal Indian lands for a town site, and there are outstanding invalid conveyances which cloud the title of purchasers of lots, the United States may maintain a suit in equity for the cancellation of such instruments.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. § 27.\*]

**6. COURTS (§ 508\*)—LANDS—SUIT BY UNITED STATES TO CANCEL CONVEYANCES —INJUNCTION.**

A federal court *held* to have authority, in a suit by the United States to cancel conveyances of Indian lands, to grant a temporary injunction restraining defendants, during the pendency of the suit, from suing out or enforcing any execution or process based upon judgments rendered by other courts establishing the validity of such conveyances, to which judgments the United States was not a party.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1418–1430; Dec. Dig. § 508.\*]

In Equity. Suit by the United States against E. Dowden and others. On demurrer to bill and motion for temporary injunction. Demurrer overruled, and motion for injunction sustained in part.

William J. Gregg, U. S. Atty.
Bond & Melton, for defendants.

CAMPBELL, District Judge. The present consideration of this case is on demurrer to the bill and application for temporary injunction. The defendants having in the meantime filed their demurrer to the bill, the demurrer and application for temporary injunction were by agreement of counsel heard together.

It appears from the bill that the land in controversy in this case was originally a part of the lands of the Choctaw and Chickasaw Tribes of Indians, located in what was formerly the Chickasaw Nation, Ind. T., now Grady county, Okl. On July 22, 1903, a certificate of allotment, covering a portion of this land, was issued by the Commission to the Five Civilized Tribes, in the name of Aaron Col-

---

bert, then deceased, who prior to his death was a duly enrolled citizen of the Chickasaw Nation, of three-quarter Indian blood. This allotment was selected by his administrator. On January 3, 1905, a certificate of allotment to the remainder of the land in controversy was issued by the Commission to the Five Civilized Tribes to Carrie L. McClure, an intermarried Choctaw citizen, duly enrolled. It further appears that on or about May 27, 1905, the Secretary of the Interior, acting through the Commission to the Five Civilized Tribes, reserved the lands in controversy for town-site purposes, as the town of Tuttle, in the Chickasaw Nation, Ind. T., now Grady county, Okl., and directed that the allotment certificates theretofore issued covering this land, as above referred to, be returned to the Commissioner for cancellation, and upon order of the Commission to the heirs of the said Aaron Colbert and to the said Carrie L. McClure, the respective certificates of allotment were returned to the Commission and stamped canceled, and said allottees selected and were allotted other lands in lieu thereof. The return of these certificates of allotment was subsequent to May 27, 1905, the date when the order reserving the land for town-site purposes was issued. Thereafter the land in controversy was surveyed and platted and the lots scheduled and sold to various purchasers, pursuant to the town-site provisions of the various acts of Congress relating to the Choctaw and Chickasaw Nations. It appears from the bill that a portion of the purchasers of said lots have paid the government in full therefor, and have received patents for the same, and that others have made all but the final payments upon said lots, and are ready to make said final payment but for the claims and allegations in regard to said land urged and instituted by the defendant Dowden.

It appears from the bill that subsequent to the issuance of the allotment certificate in the name of the said Aaron Colbert, deceased, and on the 11th day of September, 1903, Alexander Colbert and Martha Colbert, the father and mother of Aaron Colbert, deceased, executed to the defendant Dowden, in consideration of the sum of $1,500, a warranty deed purporting to convey to the said Dowden the lands theretofore allotted in the name of the said Aaron Colbert. On January 9, 1904, one Billy Colbert, purporting to be the paternal grandfather of the said Aaron Colbert, deceased, for a consideration of $1 and "the further consideration of the love and affection which I have for my son Alexander Colbert," executed what purported to be a general warranty deed to the defendant Dowden, covering said Aaron Colbert allotment. On the ——— day of January, 1904, Ellis Colbert, Washington Colbert, and John Colbert, in consideration of the sum of $1, executed what purports to be a quitclaim deed to the defendant Dowden, purporting to convey to him their interest in the Aaron Colbert allotment. On January 3, 1905, the same date upon which she received her certificate of allotment, Carrie L. McClure executed to the defendant Dowden and one E. H. Perry a warranty deed purporting to convey to them the lands comprising her allotment, as set forth in said allotment certificate. Under the foregoing deeds, the defendant Dowden claims title to the lands in controversy.

The bill charges that heretofore on a date not specifically given

the defendant Dowden filed in the Supreme Court of the District of Columbia a proceeding or petition for a writ of mandamus against the Secretary of the Interior to compel him to issue and deliver to the said Aaron Colbert and Carrie L. McClure patent deeds of conveyance to all of the land embraced in the town site of Tuttle and covered by the allotment certificates above referred to, which suit the complainant alleges is still pending undetermined in said court.

It is further charged that on the 7th day of June, 1907, the defendant Dowden instituted a suit in the United States Court for the Southern District of the Indian Territory, at Chickasha against each of the several persons who have purchased lots from the complainant through the Chickasaw Town-Site Commission in the town of Tuttle, about 125 persons in number, which cause before trial, and owing to the intervention of statehood, was passed to the district court of the Fifteenth judicial district of the state of Oklahoma, sitting in Grady county, and that upon the 8th day of April, 1908, a judgment was entered in said cause against each of the defendants therein named, who were and are purchasers of lots in the town site of Tuttle, in which judgment the defendant Dowden was decreed to be the owner in fee of the lands in controversy; that the schedule, appraisement, and sale of lots by the town-site commissioners and appraisers to the defendants was without authority; that such schedules, appraisements, and sales, so far as the same involved the lands belonging to the defendant Dowden, were without authority of law and void; and that the patents executed and delivered to the defendants in that suit, purporting to convey certain lots in the town of Tuttle, were issued without authority of law, and were void, and cast a cloud upon plaintiff's title and were therefore by the court canceled, set aside, and held for naught, and removed as a cloud upon the title of the said Dowden in and to said land.

It is further charged in the bill that on the 19th day of July, 1910, the defendant Dowden filed in the district court of Grady county, Okl., his petition against a large number of the purchasers of lots from the complainant through the Chickasaw Town-Site Commission, in the said town of Tuttle, seeking an adjudication of the title to said lots to be in the defendant Dowden, and for possession of the same, which action is now pending undetermined in said court.

It is further charged that the defendant Dowden has caused to be placed of record the deeds above referred to. It is charged in the complaint that the said deeds were executed at a time when the parties grantor therein had no right, title, estate, or interest in the land sought to be conveyed, and are each illegal, and should be adjudicated by the court to be wholly void, inoperative, and of no force and effect as instruments of conveyance against the Choctaw and Chickasaw Nations and the complainant. And it is further charged that each of said deeds was executed at a time when, under the law then in force governing the alienation and transfer of title to lands in the Choctaw and Chickasaw Nations, the grantors in said deeds could not have legally made such conveyances. It is further charged that in none of the proceedings heretofore instituted and

prosecuted by the defendant Dowden, in any of the courts above mentioned, has the complainant, the United States, or the Choctaw and Chickasaw Nations, been made a party to such proceedings, nor has any judgment or decree been entered against either of them in said proceedings; and that the judgment and proceedings had in the state courts were and are illegal, and should be adjudicated by the court to be wholly void as against the complainant and the Choctaw and Chickasaw Nations, for the reason that said courts had no juris-diction over complainant or the Choctaw or Chickasaw Nations, and over the subject-matter of said suits, neither the complainant nor the Choctaw or Chickasaw Nations having consented to be sued in any of said courts; and that said judgments and decrees of said courts are and should be adjudged and decreed by the court to be void and of no effect as against the several defendants therein named, for the reason that said defendants cannot defend against said action, they having no title to the lands therein described which could be set up or interposed as a defense in said suits.

It is further charged that the purported deeds to the said Dowden above referred to and the several judgments obtained by him in the Oklahoma state courts and the proceedings instituted and now main-tained by him in the Oklahoma state courts and the District of Col-umbia, each and all cast clouds upon the title to the land contained within the town site of Tuttle, and greatly hinder, delay, embarrass, and prevent the complainant from proceeding to collect from the parties to whom said lands were scheduled and sold the remaining unpaid balance of the purchase price of said lands, and hinder, delay, and prevent the complainant from executing and delivering to the purchasers deeds of conveyance of the title of said lots, and the placing of such purchasers' in unrestricted peaceful and quiet posses-sion of the same, and that the conduct and action of the said defend-ants in taking the deeds heretofore mentioned and recording the same, and in instituting, prosecuting, and maintaining the several suits above referred to, is all for the purpose of hindering, delaying, inter-fering with, and defeating the complainant in the discharge of its duty toward the Choctaw and Chickasaw Nations or Tribes of Ind-ians, as required by law, and does hinder, delay, and prevent the complainant from the due execution, fulfillment, carrying out, and completion of the policy of the United States as declared by its acts of Congress and the final disposition, sale, and disposal of town lots in the Choctaw and Chickasaw Nations; and that said acts of the defendants hinder and delay and prevent the complainant from col-lecting the final payments due it from the purchasers of said town lots and from finally executing and delivering, to the persons lawfully entitled thereto, deeds conveying perfect title to the said lots, all to the great and irreparable injury and damage of the complainant, and in violation of its rights to so execute and carry into effect the laws of the United States, in accordance with their true meaning, and to their full effect, and finally to close up the town-site business in the Choctaw and Chickasaw Nations.

Pending this suit the complainant prays a temporary injunction against the defendants, restraining them from further proceeding to

prosecute the several actions above referred to, pending in the several courts of the state of Oklahoma and the district of Columbia, and enjoining them from taking any further steps or doing any further thing in connection with the prosecution of any of said proceedings in any of said courts, or procuring the issuance of any execution or process from said courts upon any judgments rendered in said causes; that upon final decree, the title to the land in controversy, except such as is already covered by patent to lot purchasers, be decreed to be in the Choctaw and Chickasaw Nations and the complainant, to be dealt with and disposed of in the manner provided by law for the sale and disposition of town sites in said nations; that the several deeds and instruments of conveyance to the defendant Dowden, above referred to, be decreed to be void and of no force and effect, and be canceled; that all judgments and decrees by any of the courts above referred to, so far as they attempt to vest, deliver, or decree any right, title, or interest in any of the lands in controversy in the defendant Dowden, be decreed void and canceled and annulled; and that upon final hearing the defendants be perpetually enjoined from setting up or asserting any right, title, or interest to the land in controversy as against the complainant herein, or the Choctaw or Chickasaw Nations, or any purchasers of said lots, and from taking any steps or doing any acts or performing anything looking toward the assertion or establishment of any right, title, estate, or interest in any of said land in and by virtue of any of the deeds, judgments, or decrees above referred to or that may be the result of actions now pending undetermined.

By their demurrer the defendants urged that it appears from the bill that the complainant is not entitled to the relief prayed; that this court has no jurisdiction to enjoin the prosecution of a suit in a state court of which the state court has acquired prior jurisdiction and where the state court has already rendered a decree therein; that the plaintiff is without capacity to maintain the action.

It appears from the bill that the respective allotments involved had been selected and certificates of allotment issued to the allotees prior to the execution of the purported conveyances on the part of the heirs in the case of the Colbert allotment and by Carrie L. McClure, the allottee, as to her allotment. Had these heirs and Carrie L. McClure an alienable interest in these lands at the time these deeds were executed, and, if so, did that interest pass to the defendant Dowden by the deeds relied upon? The provisions under which the lands in controversy were allotted are contained in the Choctaw and Chickasaw agreement approved July 1, 1902 (Act July 1, 1902, c. 1362, 32 Stat. 641); the principal sections relating thereto being as follows:

"Sec. 11. There shall be allotted to each member of the Choctaw and Chickasaw Tribes as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allotable land of the Choctaw and Chickasaw Nations, and to each Choctaw and Chickasaw freedman, as soon as practicable after the approval by the Secretary of the Interior of his enrollment, land equal in value to forty acres of the average allotable land of the Choctaw and Chickasaw Nations. * * *

"Sec. 12. Each member of said tribes shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and separate certificate and patent shall issue for said homestead.

"Sec. 13. The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment.

"Sec. 14. When allotments as herein provided have been made to all citizens and freedmen, the residue of lands not herein reserved or otherwise disposed of, if any there be, shall be sold at public auction under rules and regulations and on terms to be prescribed by the Secretary of the Interior, and so much of the proceeds as may be necessary for equalizing allotments shall be used for that purpose, and the balance shall be paid into the Treasury of the United States to the credit of the Choctaws and Chickasaws and distributed per capita as other funds of the tribes.

"Sec. 15. Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said lands may be alienated under this act, nor shall said lands be sold except as herein provided.

"Sec. 16. All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent: Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value."

"Sec. 22. If any person whose name appears upon the rolls, prepared as herein provided, shall have died subsequent to the ratification of this agreement and before receiving his allotment of land, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any other cause such selection be not so made within a reasonable and practicable time, the Commission to the Five Civilized Tribes shall designate the lands thus to be allotted.

"Sec. 23. Allotment certificates issued by the Commission to the Five Civilized Tribes shall be conclusive evidence of the right of any allottee to the tract of land described therein; and the United States Indian agent at the Union Agency shall, upon the application of the allottee, place him in possession of his allotment, and shall remove therefrom all persons objectionable to such allottee, and the acts of the Indian agent hereunder shall not be controlled by the writ or process of any court.

"Sec. 24. Exclusive jurisdiction is hereby conferred upon the Commission to the Five Civilized Tribes to determine, under the direction of the Secretary of the Interior, all matters relating to the allotment of land."

Pursuant to the foregoing provisions of law, the selection was made for Aaron Colbert, deceased, and certificate of allotment issued in his name, as provided by section 22. By section 23 this allotment certificate was conclusive evidence of the right of the heirs to the land therein described.

[1] Of course, as to whether the interest in the land conveyed by the allotment certificate was alienable depends upon whether these heirs as to this land came within some of the provisions of law imposing restrictions upon alienation. Under the treaty and grant by

194 F.—31

which these tribal lands were originally vested in the Choctaw and Chickasaw Nations, the tribes could not alienate them without the consent of the United States, and it is contended by counsel for complainant that these restrictions upon alienation followed the land into the hands of the individual allottees, and that even if it does not appear as to any particular land that Congress in providing for the allotment to the individual members of the tribes imposed restrictions upon its alienation, still it cannot be alienated by such allottee without the consent of the United States, unless such right of alienation affirmatively appears in the acts of Congress. To this I cannot agree. The Commission to the Five Civilized Tribes was created and empowered to negotiate an extinguishment of the tribal title to these lands and an allotment thereof to the members of the tribes in severalty. Wallace v. Adams, 204 U. S. 415, 27 Sup. Ct. 363, 51 L. Ed. 547. The restrictions upon the alienation which attached to the tribal title must be held to have ceased with the extinguishment of that title. Doe v. Wilson, 23 How. 457, 16 L. Ed. 584.

[2] The first act relating to the allotment of the lands of the Choctaws and Chickasaws is that commonly known as the "Atoka Agreement," incorporated in the Act of June 28, 1898, c. 517, 30 Stat. 495. There is no provision in that agreement such as appears in the Act of 1902, supra, providing for allotments in the name of deceased members of the tribe, who, if living, would be entitled to allotments, and for the vesting of such lands in the heirs. The Atoka agreement contemplated only those living at the time allotment should be made. But when the supplemental agreement of 1902, supra, was made, it covered not only the allotments to the living members provided for in sections 11 and 12, but also realizing that in the nature of things some of those entitled to an allotment would die before allotment could be made, provided by section 22 that in such case the heirs of such deceased member, according to the Arkansas law then in force in the Indian Territory, should take the title to such allotment as the deceased would have been entitled to if living, rather than that it should inure to the benefit of all the members of the tribe. By section 12 each member is required to designate a homestead out of his allotment, equal in value to 160 acres of average allottable land, which shall be inalienable during his life, not exceeding 21 years from date of certificate. In my opinion, this homestead provision cannot have any application to an allotment made in the name of the deceased allottee, because the language used confines it to living allottees and the reason for such provision can only exist in the case of a living allottee. By section 15, we see that lands allotted to members shall not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under the act. Nor shall said lands—that is, lands allotted to members and freedmen—be sold except as provided in the act. Then by section 16 it is provided that "all lands allotted to members of said tribes, "except homesteads, shall be alienable after issuance of patent, one-fourth in acreage in one year, one-fourth in three years, and the balance in five years, in each case from date of patent, with the further provision that such land—that is, lands allotted to members—

shall not be alienated by the allottee, or his heirs, at any time before the expiration of the Choctaw and Chickasaw tribal government, for less than its appraised value. It is clear, that, had Aaron Colbert been living when the certificate of allotment was issued to him, these restrictions of one, three, and five years would have attached to his land, other than the homestead, and had he died before the expiration of such restriction period, his heirs would have taken the land subject to such restrictions. Goodrum v. Buffalo, 162 Fed. 817, 89 C. C. A. 525. The act provides that, notwithstanding his death prior to selection of allotment, the land shall be allotted in his name and shall "descend" to his heirs under the Arkansas law. In Shulthis v. Mac-Dougal, 170 Fed. 529, 95 C. C. A. 615, the Circuit Court of Appeals, in construing a similar provision of the Creek law, say:

"The word 'descend' is, of course, inapplicable to the actual contingency provided for by the statute, because that contingency contemplates the death of the child before he had actually become seised of any interest in the land. The word 'descend' is a word of art, and indicates the transference of property by inheritance. If any significance is to be given to it as used in this section, it must be held that the intent of the parties to the agreement was that the land should pass to the same persons and in the same proportion that it would have passed if the child had died seised of it. Any other construction simply obliterates this word, and makes the land pass to the parties who are heirs directly by allotment from the tribe. The statute itself not only declares that it shall descend, but also declares that it shall be allotted and distributed to the heirs. It is manifest, therefore, that both ideas were in the minds of the parties to the agreement. * * * It was never the intent, however, either of the tribe or of the federal government, to grant, to parties having a kinsman who had died before the actual making of the allotment, additional lands as a bounty. These kinsmen got all their right to additional lands under or through the enrolled member who had died. Whether the ancestor was actually seised of the property or not in his lifetime was immaterial. It was the intent of the statute that the property should pass by the same right and in the same manner that it would have passed if the person enrolled had survived to receive his allotment. The tribe was not bestowing such land as a bounty, but was simply providing for the right of inheritance."

Notwithstanding the death of a duly enrolled member before selection of his allotment, it was provided that the allotment should be made in his name and should "descend" to his heirs. As held in the Shulthis Case, supra, the scheme of the statute clearly indicates that the land was to be regarded the same as if it had been inherited, and that it should be treated the same as if Aaron Colbert had survived to receive his allotment. In section 11, the first section of that portion of the act relating to allotment of lands, it is provided that there shall be allotted to each member of the tribes land equal in value to 320 acres of average allottable lands, and to each freedman 40 acres. The term "member" is defined in section 3 of the act as a member or citizen of the tribe other than a freedman. By section 30 of the act, it was provided that the members or citizens to whom allotment should be made should be determined by the final rolls of citizenship therein and elsewhere provided for. That the allotment of lands to members provided for in section 11 contemplated allotments to both living and dead members, in fact all members appearing upon such final rolls, is indicated by the provision in section 22 that, in the case of deceased members, allotments shall be made in their names, notwith-

standing they are dead. As said in Shulthis v. MacDougal, supra, in relation to similar provisions in the Creek agreement, it was not the intention to grant, to parties having a kinsman who had died before the actual making of the allotment, additional lands as a bounty. They got all their right to additional land under and through the enrolled member who had died. Whether the ancestor was actually seised of the property or not in his lifetime, it was the intent of the statute that the property should pass by the same right and in the same manner that it would have passed if the person enrolled had survived to receive his allotment. It was simply providing for the right of inheritance, in cases where but for such provision the right would not have existed, because of the death of the ancestor in whom the right of allotment existed, before the title passed to him; the mere right to the allotment not being inheritable. Hayes v. Barringer, 168 Fed. 221, 93 C. C. A. 507. These allotments made in the name of dead allottees are therefore subject to the restriction provisions contained in sections 15 and 16. It follows that if the restrictions attaching to allotments made direct to living members follow the lands into the hands of the heirs of such allottees in case of their death before the term of the restriction expires, which they undoubtedly do (Goodrum v. Buffalo, supra), the same is true of lands coming to heirs by virtue of allotments made in the name of deceased allottees as provided in section 22. The land was subject to the one, three, and five year restrictions in the hands of his heirs, at the time of their attempted conveyance of the same, and such deeds are void.

I have carefully read and considered the very exhaustive and learned opinion of the state Supreme Court in Hancock v. Mutual Trust Company, 24 Okl. 391, 103 Pac. 566, wherein a conclusion contrary to that arrived at by me is announced, and I have not reached my conclusions here expressed without the most careful research and thought which I have been able to give the matter. But for the reasons above stated, and especially in view of the holding in the Shulthis Case, supra, I am forced to the conclusion that the restrictions provided in sections 15 and 16 attach to lands allotted under the provisions of section 22.

[3] Now taking the case of the Carrie L. McClure deed. It is conceded she is not of Indian blood. It is not contended that she is a minor. The land involved was not her homestead allotment. It is conceded that she was entitled to an allotment as an intermarried citizen. She had selected her allotment and received her certificate therefor. By the Act of April 21, 1904, c. 1402, 33 Stat. 189, all the restrictions upon the alienation of lands, other than homesteads, of the class of adult allottees to which she belonged, had been removed. If by the selection of her allotment and the issuance of allotment certificate therefor she acquired such title or interest in the land as might be subject to alienation, then the deed which she executed to defendant Dowden and his cograntee was sufficient to and did convey her interest in the land to them. She had done everything required of her to entitle her to the patent for the land. It does not clearly appear whether the allotment certificate, which was dated January 3, 1905, was issued immediately upon her selection of the allotment, or whether the nine months provided for contest had expired; but, in any event,

the statute makes the certificate of allotment conclusive evidence of the right of the allottee to the land described therein, and by it allottee is vested with the equitable title to the land. It does not appear from the bill that if the contest period had not expired any contest was ever filed, or that any reason existed why Carrie L. McClure was not entitled, in due time, to receive patent to her allotment. Wallace v. Adams, supra; Ballinger v. Frost, 216 U. S. 240, 30 Sup. Ct. 338, 54 L. Ed. 464. Her deed to Dowden and his cograntee therefore conveyed to them her equitable interest in the land, and no reason appears from the bill why they were not entitled to have patent issue to her in due time, conveying the legal title.

[4] If the conclusion here reached that defendant Dowden took no title by his deeds from the heirs of Aaron Colbert, deceased, is correct, then he can hardly be heard to complain because, as he contends, after issuance of the initial allotment certificate, the Secretary was without authority to request the return of such certificate for cancellation, and, upon compliance therewith, direct that another and different allotment be made in lieu of the original. Had rights of third parties intervened, this might not have been done; but where it is solely a matter between the allottee and the government, I am of opinion that, before patent issues, the allottee may by agreement with the officers of the Interior Department, having in charge the matter of allotment, voluntarily surrender his allotment certificate already issued, and take another allotment, and that upon such exchange and cancellation of the former certificate the lands it covers again become unallotted lands of the tribe.

[5] If this be true, then assuming the averments of the bill to be true, so far as the lands originally allotted to the Colbert heirs are concerned, the Secretary of the Interior had authority, upon the recommendation of the Commission to the Five Civilized Tribes, to set aside and reserve from allotment such lands at the station of Tuttle. Act of May 31, 1900, c. 598, 31 Stat. 221; Act of July 1, 1902, c. 1362, 32 Stat. 641. If in the exercise of that authority, outstanding invalid instruments relating to the lands interfere with the work of the government in the disposition of such town site, by clouding the title, the United States may maintain a suit to cancel such instruments. United States v. Rea-Read Mill & Elevator Co. (C. C.) 171 Fed. 501.

For the foregoing reasons, I find that as to the lands originally allotted in the name of Aaron Colbert, deceased, the demurrer is not well taken, and, as it is general in its nature, it should therefore be overruled.

[6] As to the prayer for temporary injunction restraining the defendants from further proceeding in the state and other courts, and from suing out or procuring the issuance of executions or process from such courts upon judgments rendered or to be rendered, without reviewing here the many authorities cited by counsel on both sides, I am of opinion that this court may properly enjoin the defendants during the pendency of this action from suing out or enforcing any execution or other process based upon judgments rendered or to be rendered in such other courts, which if enforced would dispossess persons now in possession of any town lots in said town of Tuttle, origi-

nally a part of the land initially allotted to Aaron Colbert, deceased, and for which lots the final patents have not yet been issued as provided by law; and to this extent such temporary injunction may issue, but is denied in all other respects.