## In re LANDS OF FIVE CIVILIZED TRIBES.

### THE 30,000 LAND SUITS.

(District Court, E. D. Oklahoma. August 14, 1912.)

1. INDIANS (§ 15*)—LANDS—RESTRICTIONS ON ALIENATION—EFFECT OF DEATH OF ALLOTTEE.

The provision of Choctaw and Chickasaw Supplemental Agreement July 1, 1902, c. 1362, 32 Stat. 643, § 16, that surplus lands allotted to members of the tribes shall be alienable "one-fourth in acreage in one year; one-fourth in acreage in three years and the balance in five years, in each case from date of patent," is not in any way limited or modified by the proviso "that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal government for less than its appraised value," which could only become operative as to any particular tract after the expiration of the one, three, or five years' restriction while the tribal governments were still in existence, but imposes a restriction on alienation not personal to the allottee, but which runs with the land and affects it as well in the hands of heirs as of the original allottee, and prohibits alienation by an allottee member of the tribes or his heirs until the expiration of the periods named.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*]

2. INDIANS (§ 15*)—RESTRICTION ON ALIENATION OF LANDS—CONSTRUCTION OF AGREEMENT—"DATE OF PATENT."

Choctaw-Chickasaw Supplemental Agreement July 1, 1902, c. 1362, 32 Stat. 643, § 16, provides that "all lands allotted to members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year; one-fourth in acreage in three years and the balance in five years, in each case from date of patent." Allotments to members of the Choctaw and Chickasaw Tribes were made under what is known as the Atoka Agreement, embodied in Curtis Act June 28, 1898, c. 517, 30 Stat. 495, and such Supplemental Agreement. The Curtis

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Act provided that patents to the allottees should be jointly executed and delivered by the Principal Chief of the Choctaw Nation and the Governor of the Chickasaw Nation, and the Supplemental Agreement made no change in that respect. There was no provision in either of the agreements, as there was in those with the Creeks and Cherokees, requiring the patents to be approved by the Secretary of the Interior. *Held*, that in view of the provision of Act March 3, 1893, c. 209, 27 Stat. 645, authorizing generally allotments in severalty of the lands of the Five Civilized Tribes, that upon such allotment the reversionary interest of the United States in the lands allotted "shall be relinquished and shall cease," there was no necessity for such approval to operate as a relinquishment of that interest, and that the "date of patent" referred to in said section 16 of the Supplemental Agreement, from which the periods of restriction were to run, was the date when the patent was signed by the second of the two chief executives of the tribes.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*

For other definitions, see Words and Phrases, vol. 2, pp. 1830, 1831.]

3. INDIANS (§ 15*)—RESTRICTIONS ON ALIENATION OF LANDS.

The term "issuance of patent," as used in said Act July 1, 1902, c. 1362, 32 Stat. 643, § 16, under the law as it then stood, referred to the time when the patent was delivered to the allottee, there being no provision making its record necessary to the passing of title; but under Act April 26, 1906, c. 1876, 34 Stat. 139, § 5, which provides that "all patents or deeds to allottees * * * shall be recorded in the office of the Commissioner to the Five Civilized Tribes, and when so recorded shall convey legal title," and repeals all acts and parts of acts inconsistent therewith, the recording of a patent is equivalent to its issuance under former acts so far as it affects the period of restriction.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*]

4. INDIANS (§ 15*)—RESTRICTIONS ON ALIENATION OF LANDS—ALLOTMENTS TO FREEDMEN—STATUS.

Under the Atoka Agreement with the Choctaw and Chickasaw Nations, embodied in Curtis Act June 28, 1898, c. 517, 30 Stat. 495, and Supplemental Agreement July 1, 1902, c. 1362, 32 Stat. 641, the entire allotments to freedmen of such tribes had the status of homesteads, and the restrictions on alienation therein imposed were not removed by Act April 21, 1904, c. 1402, 33 Stat. 189, removing restrictions on the sale of lands of all allottees not of Indian blood, except as to minors and homesteads.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*]

5. INDIANS (§ 15*)—RESTRICTIONS ON ALIENATION OF LANDS—HOMESTEADS OF DECEASED SEMINOLE ALLOTTEES.

Act March 3, 1903, c. 994, 32 Stat. 982, which provides in section 8 that homestead allotments to Indians of the Seminole Tribe "shall be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the deed for the allotment," had the effect of reducing the term of inalienability from a perpetuity, as provided in the original act under which the allotments were made, and on the death of an allottee, although before patent, his equitable interest becomes immediately alienable by his heirs.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*]

6. INDIANS (§ 15*)—RESTRICTIONS ON ALIENATION OF LANDS—HOMESTEADS OF DECEASED CREEK ALLOTTEES.

Under Creek Supplemental Agreement June 30, 1902, c. 1323, 32 Stat. 500, § 16, construed in the light of contemporaneous legislation relating

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to all others of the Five Civilized Tribes, the general restriction on alienation for five years from the date of the agreement applies only to the surplus lands of an allottee, and on the death of an allottee, without leaving children born after May 25, 1901, whether before or after the expiration of the five years' restriction, his homestead allotment is immediately alienable by his devisees in case of a will, or by his heirs in the absence of a will.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*]

In Equity. Suits by the United States to set aside a large number of alleged illegal conveyances of lands of the Five Civilized Tribes of Indians, known as the "30,000 Land Suits." On demurrers to bills raising various questions.

## Choctaw-Chickasaw Cases.

CAMPBELL, District Judge. [1] In the argument on Saturday was presented the question whether in the case of the death of members, other than freedmen, of the Choctaw and Chickasaw Nations after receiving their allotments, and within the restriction periods of one, three, and five years mentioned in the Supplemental Agreement (Act July 1, 1902, c. 1362, 32 Stat. 642), the heirs of such deceased allottees might sell the surplus lands before the expiration of such restriction periods; that is to say, whether the restrictions, other than that contained in the proviso to section 16, ran with the land, or were personal to the allottee, and ceased with his death. It cannot be doubted that unless the restrictions upon the lands in the hands of the heirs, contended for by the government, can be found in the Choctaw-Chickasaw Supplemental Agreement of July 1, 1902, they did not exist. If they are to be found in the agreement, it must be in one of the four sections thereof reading as follows:

"12. Each member of said tribes shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and separate certificate and patent shall issue for said homestead.

"13. The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment."

"15. Lands allotted to members and freedmen shall not be affected or encumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided.

"16. All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years: in each case from date of patent: Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value."

Section 12, above quoted, clearly relates only to homesteads. Section 13 relates to freedman allotments. Clearly the restrictions con-

tended for are in neither of these sections, and must therefore be in section 15 or 16, or both. Section 15 is negative in its effect, protecting the land from incumbrance by any deed, debt, or obligation of any character contracted prior to the time at which the land may be alienated under the act, and negativing the idea that under any circumstances might it be sold or incumbered before the time at which it might be alienated. Here is involved a restriction upon incumbrance and sale of the land, but for the time such restriction is to continue we must look to section 16, which fixes the time when such lands may be alienated. Section 15 designates the character of certain of the restrictions, while they shall exist, and section 16 fixes the term of their existence. For the answer, therefore, to the question whether they continue longer than the life of the allottee we must look to section 16. That alone is the section which affirmatively determines when the land may be alienated, and by the provisions of section 15 all restrictions, except that contained in the proviso to section 16 cease when the right of alienation attaches. If the proviso had not been attached to section 16, it would have read:

"All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead, as herein provided, shall be alienable after issuance of patent, as follows: One-fourth in acreage in one year; one-fourth in acreage in three years; and the balance in five years; in each case from date of patent."

In view of the provisions of section 15, this amounts to saying that the lands shall be inalienable until the expiration of the periods mentioned. In the case of Goodrum v. Buffalo, 162 Fed. 817, 89 C. C. A. 525, decided by the Circuit Court of Appeals for this circuit, the court was considering an act of Congress relating to the Quapaw Tribe of Indians, whereby the previous action of the National Council of that tribe, providing for allotment of their land in severalty, was ratified by Congress. Act March 2, 1895, c. 188, 28 Stat. 907. In this act it was provided (referring to said action of the council) that:

"The Secretary of the Interior is hereby authorized to issue patents to said allottees, in accordance therewith; provided, that said allotments shall be inalienable for a period of 25 years from and after the date of said patents."

One question decided in the Buffalo Case was whether this restriction was personal to the allottee, and ceased with his death, or ran with the land and affected it in the hands of his heirs until the expiration of the 25 years from date of patent. The court said:

"The language of the statute under which the patent was issued to John Medicine is 'that said allotments shall be inalienable for a period of 25 years from and after the date of said patents.' It is a limitation attached to and running with the land, in no wise dependent upon the life or death of the patentee. It was as much within the policy and purpose of the government to see that the heirs of the allottee, in case of his death, were protected against alienation of the land, as the allottee himself; otherwise they might become a charge upon the public, and the beneficent policy of the government in bringing about the allotment of lands in severalty would be thwarted."

If it were not for the proviso, attached to section 16, the ruling in the Buffalo Case, supra, would certainly apply to this case; for it would be a clear construction by the Circuit Court of Appeals of an

essentially similar act. But we have the proviso added here, which it is contended evidences the intention of Congress and the tribes. that the one, three, and five years' restrictions should be personal to the allottee, and cease with his death. And it is urged that this contention is sustained by the decision of the Supreme Court in Mullen et al. v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, decided April 15, 1912.

In the Mullen Case, the Supreme Court, after quoting sections 12, 13, 15, and 16, say:

"It will be observed that the homestead lands are made inalienable 'during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment.' The period of restriction is thus definitely limited, and the clear implication is that, when the prescribed period expired, the lands were to become alienable; that is, by the heirs of the allottee upon his death, or by the allottee himself at the end of the 21 years. Thus, with respect to homestead lands, the supplemental agreement imposed no restriction upon alienation by the heirs of a deceased allottee. And the reason may be found in the fact that each member of the tribes, each minor child as well as each adult, duly enrolled as required, was to have his or her allotment; so that each member was already provided with a homestead as a part of the allotment, independently of the lands which might be acquired by descent. On the other hand, the proviso of paragraph 16, which relates to the additional portion of the allotment, or the so-called 'surplus' lands, contains a restriction upon alienation not only by the allottee, but by his heirs. Whatever may have been the purpose, a distinction was thus made with regard to the disposition by heirs of the homestead and surplus lands respectively."

Here the Supreme Court was remarking the fact that a distinction was made with regard to alienation by the heirs as between the homestead and the surplus, the distinction being that the former was not restricted, and the latter was restricted in the hands of the heirs; the restriction being contained in the proviso. Evidently it did not then occur to the court that the one, three, and five years' restriction attached to the land in the hands of the heirs, as well as in the hands of the allottee, or it would not have referred to the restriction affecting the heirs as having been found only in the proviso. It is further said by the court:

"We have, then, a case where all the allotted lands going to the heirs are of the same character, and there is no restriction upon the right of alienation expressed in the statute. Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death. The only difficulty springs from the language of paragraph 16, limiting the right of heirs to sell 'surplus' lands. But, on examining the context, it appears that this provision is part of the scheme for allotments to living members, where there is a segregation of homestead and surplus lands, respectively. Whatever the policy of such a distinction which gives a greater freedom for the disposition by heirs of homestead lands than of the additional lands, there is no warrant for importing it into paragraph 22, where there is no such segregation. It would be manifestly inappropriate to imply the restriction in such cases so as to make it applicable to all the lands taken by the heirs, and there is no occasion, or authority, for creating a division of the lands so as to impose a restriction upon a part of them."

But it must be remembered that in the Mullen Case the question was not, in the first instance, what were the nature and extent of

the restrictions imposed by sections 15 and 16, but whether, whatever restrictions, if any, these sections did impose upon the lands in the hands of heirs of the allottees, would be imported into section 22. The court found that the proviso to section 16 imposed a certain restriction upon the land in the hands of the heirs. Whether or not that section had imposed any other restriction upon the lands in the hands of the heirs, the one imposed by the proviso, at any rate, would have attached to section 22, had the government's contention in that case been correct. The first question to be determined, then, in the Mullen Case, was whether, whatever restrictions were imposed by sections 15 and 16, so far as the heirs were concerned, attached to the lands allotted to the heirs under section 22. This the Supreme Court decided in the negative, and it therefore became unnecessary to decide the character or extent of the restrictions imposed by sections 15 and 16. It cannot, therefore, be said that the question involved here was decided by the Mullen Case. The restriction imposed by the proviso to section 16, prohibiting alienation for less than the appraised value, can only become operative as to any particular tract after the expiration of the one, three, or five years restriction, as the case may be. Until that time, no alienation is permitted. Hence, until then, there is no necessity of placing a minimum purchase price upon the same. The parties to the agreement, therefore, must have contemplated that the tribal governments might continue after the expiration of the one, three, and five year periods. The proviso clearly expresses the intention that during such continuance of the tribal governments, after the expiration of the said restriction periods, the further limitation as to the purchase price, not being less than the appraised value, should affect the lands in the hands of the allottee and his heirs. But, when by alienation it should pass into the hands of third parties, there was then no further duty or desire by the parties to the agreement to control it in any way in the hands of such third parties, even though, as in many instances might be the case, the tribal governments were still in existence. Hence, instead of merely providing in the proviso, as in the former part of the section, that the land should be inalienable for less than the appraised value until the expiration of the tribal governments, which would have affected it in the hands of third persons as well as in the hands of the allottee or his heirs, the limitation in the proviso specifically mentions the allottee and his heirs as the ones, and the only ones, affected by the limitation. As sections 15 and 16 construed together clearly provide that one-fourth of the land, in acreage, allotted to a member, shall not be alienated before the expiration of one year, and one-fourth, in acreage, shall not be alienated before the expiration of three years, and the remainder not before the expiration of five years, in each case from date of patent, and as I do not find that this provision is in any way limited or modified by the proviso relating to sale for less than the appraised value, it is my opinion that, as held in the Buffalo Case, supra, the one, three, and five years' restrictions run with the land, and affect it as well in the hands of the heirs as of the original allottee.

This construction I think entirely consistent with the language of the agreement, and, so construed, evidences the same policy expressed in the contemporary Creek and Cherokee Agreements as to restricting the alienation of the lands in the hands of the heirs as well as of the allottees.

### · "Date of Patent" Choctaw-Chickasaw Agreements.

[2] The question is presented as to what may be said to be the "date of patent," as the term is used in section 16 of the Choctaw-Chickasaw Supplemental Agreement, approved July 1, 1902. The section reads:

"All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent, as follows: One-fourth in acreage in one year; one-fourth in acreage in three years, and the balance in five years; in each case from date of patent: Provided that such lands shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value."

It is contended by the government that the date of patent is determined by the date of approval thereof by the Secretary of the Interior. On the other hand, the defendants contend that it is the date upon which the patent is signed by the last Governor or Principal Chief of the tribe, as the case may be. In the act approved March 3, 1893 (chapter 209, 27 Stat. 645), Congress took the initial step in the process of legislation by which has been accomplished the allotment of the lands of the Five Civilized Tribes in severalty to the individual members thereof. By section 15 of that act it was provided:

"The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws, and Seminoles; and upon such allotments the individuals to whom the same may be allotted shall be deemed to be in all respects citizens of the United States. And the sum of twenty-five thousand dollars, or so much thereof as may be necessary, is hereby appropriated to pay for the survey of any such lands as may be allotted by any of said tribes of Indians to individual members of said tribes; and upon the allotment of the lands held by said tribes respectively the reversionary interest of the United States therein shall be relinquished and shall cease."

By the same act there was established the Commission to the Five Civilized Tribes, which has since represented the United States in negotiations with the Indians looking to the allotment of lands contemplated by that act. The Choctaws and Chickasaws did not avail themselves of the permission granted by section 15, above quoted, to allot their lands, but in the act approved June 28, 1898 (chapter 517, 30 Stat. 495), known as the "Curtis Act," was incorporated what is commonly known as the "Atoka Agreement," between the Commission and representatives of the two tribes mentioned, providing in detail for the allotment of their lands in severalty to the members thereof. The agreement began with this provision:

"That all the lands within the Indian Territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes so as to give to each member of these tribes, so far as possible, a fair and equal

share thereof, considering the character and fertility of the soil and the location and values of the lands."

Following the portion of this agreement relating in detail to the division of the land between the individual members by allotment, it is provided:

"That, as soon as practicable after the completion of said allotments, the Principal Chief of the Choctaw Nation and the Governor of the Chickasaw Nation shall jointly execute, under their hands and the seals of the respective nations, and deliver to each of the said allottees patents, conveying to him all the right, title, and interest of the Choctaws and Chickasaws in and to the land which shall have been allotted to him in conformity with the requirements of this agreement, excepting all coal and asphalt in or under said land. Said patents shall be framed in accordance with the provisions of this agreement, and shall embrace the land allotted to such patentee and no other land, and the acceptance of his patents by such allottee shall be operative as an assent on his part to the allotment and conveyance of all the lands of the Choctaws and Chickasaws in accordance with the provisions of this agreement, and as a relinquishment of all his right, title, and interest in and to any and all parts thereof, except the lands embraced in said patents, except also his interest in the proceeds of all lands, coal, and asphalt herein excepted from allotment. That the United States shall provide by law for proper record of land titles in the territory occupied by the Choctaw and Chickasaw Tribes."

Before allotment had been accomplished under the foregoing legislation, the Commission and representatives of the tribes entered into a Supplemental Agreement (32 Stat. 641) changing materially the provisions with regard to the amount of land each member was to receive in allotment, changing somewhat the provisions imposing restrictions upon the sale or incumbrance of the land, and providing for the disposition of allotments due deceased members. No further provision is made in this Supplemental Agreement for the execution or issuance of patents or deeds for the allotments provided for. In the portion thereof, however, relating to townsites and the sale of lots therein to the owners of improvements thereon, etc., this provision appears:

"Upon the payment of the full amount of the purchase price of any lot in any townsite in the Choctaw and Chickasaw Nations, appraised and sold as herein provided, or sold as herein provided, the chief executives of said nations shall jointly execute, under their hands and the seal of the respective nations and deliver to the purchaser of the said lot a patent conveying to him all right, title, and interest of the Choctaw and Chickasaw Tribes in and to said lot."

It will be noted that the foregoing provision as to deeds or patents for town lots is similar to that of the Atoka Agreement, regarding deeds or patents for allotments, apparently contemplating that the deeds or patents, after execution by the chief executive officers of the tribes, shall be by them delivered direct to the allottee, or the purchaser, as the case may be. Section 68 of this Supplemental Agreement provides that no act of Congress or treaty provision, nor any provision of the Atoka Agreement inconsistent with this agreement, shall be in force in said Choctaw and Chickasaw Nations, but, as, there is no provision made in the Supplemental Agreement for the execution and delivery of deeds or patents for allotments, the provision,

therefor, contained in the Atoka Agreement, as above quoted, is not in conflict, and hence must be treated as remaining in force, and the scheme of allotment in the Choctaw and Chickasaw Nations, after the Supplemental Agreement, must be found in that agreement and the provisions of the Atoka Agreement not inconsistent therewith. It is significant that in the Supplemental Agreement the same plan for passing title to the purchaser of town lots is provided as was provided in the Atoka Agreement for passing title to allotments; it being provided in both instances that the deed or patent in each case should be executed by the chief executives of both nations, and by them delivered to the allottee or purchaser, as the case might be. In the Creek and Cherokee Agreements it was provided that the deeds or patents for allotments should be executed by the Principal Chief, and by him delivered to the allottee. But there was a further provision that the conveyance should be approved by the Secretary of the Interior, which should serve as a relinquishment to the grantee of all the right, title, and interest of the United States in and to the lands embraced in the deed or patent. These lands were held by the Choctaw and Chickasaw Nations under grant from the United States in fee simple to them and their descendants to inure to them while they should exist as a nation and live on it (treaty of Dancing Rabbit Creek, Kappler's Treaties, 221), with the right of reversion to the United States only in case the Indians or their heirs should become extinct or abandon the same (Treaty of 1855, Kappler's Treaties, 532). We have seen that by the act of March 3, 1893, the consent of the United States was expressly given to the allotment of these lands by the tribes to the individual members of the tribes. By the same act, the Commission to the Five Civilized Tribes was established, whose duty it was to negotiate with the tribes for the purpose of reaching agreements for the allotment of the land; the express purpose being to bring about a condition looking to ultimate statehood. If the consent expressly given by the act of March 3, 1893, cannot be said to be in terms imported into the Atoka Agreement and the Supplemental Agreement with the Choctaw and Chickasaw nations, it is there by implication as strongly as if given in terms. A grant may be made by law as well as by a patent pursuant to law. 10 Ency. of U. S. Sup. Ct. Repts. 150, and cases cited. It is not necessary to the passing of the reversionary interest of the United States to the allottee that the agreement should contain a grant in technical terms, but the intent of Congress to do so may be gathered from the whole scope of the agreements and other congressional legislation on the subject and the facts involved. New York Indians v. United States, 170 U. S. 1, 18 Sup. Ct. 531, 42 L. Ed. 927.

There having been no provision in the agreements referred to requiring, as in the case of the other tribes mentioned, that the deeds or patents should be approved by the Secretary of the Interior, which should serve as a relinquishment of the right, title, and interest of the United States in the lands, it follows that it was the intention of Congress that this relinquishment on the part of the United States should be expressed in the legislation itself, either directly or by implication.

Whenever, pursuant to allotment as provided in the Atoka and Supplemental Agreements, the chief executive officers of the two nations had both executed a patent to the allottee, it became a completed instrument, requiring only issuance or delivery to pass the title. I therefore conclude that the "date of patent" referred to in section 16 of the Supplemental Agreement is fixed by the date upon which the last of the two chief executives of the tribes involved affixed his signature to the instrument. This establishes a definite date, apparent from the instrument itself, from which the restrictions began to run, and must be held to have been the date contemplated by the parties to the agreement as "date of patent."

## Issuance of Patent.

[3] By section 16 of the Supplemental Agreement, above quoted, it was provided that the land should be alienable "after issuance of patent" upon the expiration of the several periods mentioned. The question is presented as to when "issuance of patent" may be said to be accomplished. The term "issuance," as defined by the several dictionaries, may be said to be the act of putting, sending, or giving out; promulgation; distribution. We have seen that the Atoka Agreement provided that the chief executives of the two nations should jointly execute and "deliver" to each allottee a patent or patents conveying all right, title, and interest of the tribes in the lands allotted to him. Clearly the delivery of the patent to the allottee under this provision is its issuance. It was also provided in the Atoka Agreement that the United States should provide by law for proper recording of land titles in the territory occupied by the Choctaw and Chickasaw Tribes. By section 66 of the Supplemental Agreement it was provided that:

"All patents to allotments of land, when executed, shall be recorded in the office of the Commission to the Five Civilized Tribes within said nations in books prepared for the purpose, until such time as Congress shall make other suitable provision for record of land titles as provided in the Atoka agreement, without expense to the grantee; and such records shall have like effect as other public records."

By section 5 of the act approved April 26, 1906 (chapter 1876, 34 Stat. 139), it was provided that:

"All patents or deeds to allottees and other conveyances affecting lands of any of said tribes shall be recorded in the office of the Commissioner to the Five Civilized Tribes, and, when so recorded, shall convey legal title, and shall be delivered under the direction of the Secretary of the Interior to the party entitled to receive the same."

By section 29 of the same act, it was provided that:

"All acts and parts of acts inconsistent with the provisions of this act shall be and the same are hereby repealed."

From the provisions of the Atoka Agreement it appears that it was then contemplated that the recording of the patent had nothing to do with the passing of title to the allottee. With the allotment of the land in severalty, under provisions whereby portions of it might be alienated by the allottees from time to time, and thus

become the subject of transfer as any other real estate, the necessity for registry of land titles arose. By section 66 of the Supplemental Agreement, above quoted, Congress, as contemplated by the Atoka Agreement, provided for the recording of land titles in the office of the Commission to the Five Civilized Tribes, such record to be without expense to the allottee, and to have the same effect as other public records. Here the recording is still not made any part of the process by which title is passed to the allottee, so that until the act of April 26, 1906, above referred to, the legal title passed to the allottee upon the issuance—that is, the delivery —of patent to him and acceptance thereof by him. The "issuance of patent" was accomplished by its delivery to and acceptance by him, whether previously recorded or not. The delivery and acceptance of the patent, like the delivery and acceptance of any conveyance to land, were necessary, as the law then stood, to pass the legal title, and it was in the contemplation of the parties to the Supplemental Agreement that the allottee should not be permitted to alienate any of his land before acquiring the legal title. But in the act of April 26, 1906, we have seen that recording in the office of the Commission to the Five Civilized Tribes is made a prerequisite to the conveyance of legal title to the allottee, in that it is provided that, when so recorded, the patent shall convey legal title. All former inconsistent acts or parts of acts are repealed. Under this act, the recording of the patent is equivalent to its issuance under former acts, so far as the right to alienate is concerned.

## Whether Choctaw-Chickasaw Freedman Allotments Had Status of "Homesteads" Prior to Act of April 26, 1906.

[4] There is presented in the Choctaw and Chickasaw Nations the further question, Did the allotments to Choctaw and Chickasaw freedmen have the status of homesteads prior to Act April 26, 1906, so that Act April 21, 1904, c. 1402, 33 Stat. 189, removing restrictions from the sale of lands of all allottees not of Indian blood, except as to minors and homesteads, did not apply to such allotments?

The Atoka Agreement provided:

"All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from the date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, and which shall be inalienable for twenty-one years from date of patent. This provision shall also apply to the Choctaw and Chickasaw freedman to the extent of his allotment."

By the foregoing provision the entire allotment of the Choctaw and Chickasaw freedman became nontaxable while the title remained in the original allottee, not exceeding 21 years from the date of patent. No homestead selection was necessary on the part of the freedman allottee, because the homestead provision was made to apply to the "extent of his allotment"—that is, to his entire

allotment—and, for the same reason, separate patent was unnecessary. The provision imposing inalienability for 21 years was also made to apply to his entire allotment. This gave to the entire allotment of the Choctaw and Chickasaw freedman exactly the status of the homestead of 160 acres of an Indian member of said tribes. It was clearly the intention of the contracting parties that the entire freedman allotment should be his homestead, and was so considered by them. By the Supplemental Agreement, approved July 1, 1902 (32 Stat. 641), relating to these tribes, it was provided:

"12. Each member of said tribes shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and separate certificate and patent shall issue for said homestead."

"13. The allotment of each Choctaw and Chickasaw freedman shall 'be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment."

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"68. No act of Congress or treaty provision, nor any provision of the Atoka agreement, inconsistent with this agreement, shall be in force in said Choctaw and Chickasaw Nations."

Section 12, above quoted, provides for the selection of a homestead by each member of the tribe, other than freedmen. Such member is to designate as a homestead out of his allotment land equal in value to 160 acres of average allottable land, which shall be inalienable during his lifetime, not exceeding 21 years from date of certificate of allotment, and separate certificate and patent shall issue therefor. For the reason observed as to the Atoka Agreement, the selection of a homestead by a freedman was unnecessary, under the terms of the Supplemental Agreement, as the entire freedman allotment is there also given the same status, and for the same reason it was unnecessary to provide for separate homestead patent. The other distinctive feature of the homestead of a member not a freedman, that of inalienability during the lifetime of the allottee not to exceed 21 years, is, however, expressly made to attach to the entire allotment of each freedman. While it is not in terms called a homestead, it has all the features of the homestead of a member, not a freedman, except as to selection and separate patent, which are unnecessary to accomplish the purposes of the contracting parties. So that the provision of the Atoka Agreement, above referred to, which expressly made these freedmen allotments homesteads, cannot be said to be inconsistent with this agreement. In section 12 above quoted it is clear that the one thing sought to be accomplished by the parties to the agreement by that section was the establishment of homesteads for members not freedmen, attaching to those homesteads restrictions different from those attaching to surplus lands, obviously in order to afford such members a greater degree of protection as to their homesteads than pertained to their surplus lands. In section 13, immediately

following, still evidently having in mind the subject of homesteads, the contracting parties consider the freedmen of the tribes, and attach to their entire allotments identically the same restrictions as to alienation pertaining to homesteads of Indian members of the tribes. The intention is manifest in this latter agreement to give the freedman allotments the status of homesteads. The very terms of the Supplemental Agreement refute the contention that, as an act revisory of the Atoka Agreement, it repeals by implication the provision of the latter agreement, making freedman allotments homesteads.

"The doctrine that a statute is impliedly repealed by a subsequent statute, revising the whole matter of the first, does not apply where the revisory statute declares what effect it is intended to have upon the former, as where it provides that it shall operate to repeal all inconsistent or repugnant acts." 36 Cyc. 1081.

In the act approved April 26, 1906, it was provided:

"Lands allotted to freedmen of the Choctaw and Chickasaw Tribes shall be considered 'homesteads,' and shall be subject to all the provisions of this or any other act of Congress applicable to homesteads of citizens of the Choctaw and Chickasaw Tribes."

It is contended on the part of the government that this provision is merely declaratory of the law established by the Atoka and Supplemental Agreements, and is a legislative construction of them. The defendants contend, on the other hand, that this provision demonstrates that Congress construed the prior legislation as not constituting these freedman allotments "homesteads," and that the purpose of this provision was to change that condition, and make them henceforth "homesteads." As said by the Supreme Court in Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738:

"When several acts of Congress are passed touching the same subject matter, subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject."

The same court said in the case of United States v. Freeman, 3 How. 556, 11 L. Ed. 724:

"The correct rule of interpretation is that, if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law that all acts in pari materia are to be taken together as if they were one law. [Earl of Ailesbury v. Pattison, 1] Doug. 30; [King v. Commissioners of Excise] 2 T. R. 387, [King v. Mason] Id., 586; [King v. Inhabitants of Bowness] 4 Mau. & Sel. 210. If a thing contained in a subsequent statute be within the reason of a former statute, it shall be taken to be within the meaning of that statute ([Sir William Moore's Case] Ld. Raym. 1028), and, if it can be gathered from a subsequent statute in pari materia what meaning the Legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute (Morris v. Mellin, 6 Barn. & C., 454; [Sandiman v. Breach] 7 Id. 99). Wherever any words of a statute are doubtful or obscure, the intention of the Legislature is to be resorted to, in order to find the meaning of the words. Wimbish v. Tailbois, Plwd. 57. A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter. Stowel v. Zouch, Plwd. 366. These citations are

but different illustrations of the rule that the meaning of the Legislature may be extended beyond the precise words used in the law, from the reason or motive upon which the Legislature proceeded, from the end in view or the purpose which was designed, the limitation of the rule being that, to extend the meaning to any case not included in the words, the case must be shown to come within [the same reason upon which the lawmaker proceeded, and not only within] a like reason. This court has repeatedly, in effect, acted upon the rule, and there may be found, in the reports of its decisions, cases under it, like the cases which have been cited from the reports of the English courts. In 4 Dall. 14 [Wrong citation. See Brown v. Barry, 3 Dall. 365], 'The intention of the Legislature, when discovered, must prevail, any rule of construction declared by previous acts to the contrary notwithstanding.' In [Pennington v. Coxe] 2 Cranch, 33 [2 L. Ed. 199]: 'A law is the best expositor of itself—that every part of an act is to be taken into view for the purpose of discovering the mind of the Legislature,' etc. In the case of United States v. Fisher et al., Assignees of Blight, in the same book [2 L. Ed. 304], the court said: 'It is undoubtedly a well-established principle in the exposition of statutes that every part is to be considered, and the intention of the Legislature to be extracted from the whole,' etc. In [Wilkinson v. Leland] 2 Pet. 662 [7 L. Ed. 542]: 'A legislative act is to be interpreted according to the intention of the Legislature, apparent upon its face. Every technical rule as to the construction or force of particular terms must yield to the clear expression of the paramount will of the Legislature.' In [The Elizabeth, 1] Paine, 11 [Fed. Cas. No. 4,352]: 'In doubtful cases, a court should compare all the parts of a statute, and different statutes in pari materia, to ascertain the intention of the Legislature.' "

In Lewis' Sutherland on Statutory Construction, § 471, it is said:

"A legislative department is supposed to have a consistent design and policy, and to intend nothing inconsistent or incongruous. The mischief intended to be removed or suppressed, or the cause or necessity of any kind which induced the enactment of the law, are important factors to be considered in its construction. The purpose for which the law was enacted is a matter of prime importance in arriving at a correct interpretation of its terms."

When it is considered that the freedmen of the Creek and Seminole Nations were provided with homesteads, which were clearly excepted from the operation of the act of April 21, 1904, and that by the Atoka Agreement the allotments of the Choctaw and Chickasaw freedmen were also made homesteads, and but for the effect of the Supplemental Agreement, as construed by the defendants, would also have been excepted from the removal of restrictions effected by the act of April 21, 1904, a policy on the part of the government and the tribes to give the freedman a homestead protected by the same restrictions attaching to the homesteads of those not freedmen is clearly manifest. To warrant a construction of the Choctaw and Chickasaw Supplemental Agreement which would except the freedmen of those tribes from the operation of this policy, requires that such intention appear in the agreement in plain and unmistakable terms. I do not find that it so appears, and I conclude that it was the intention of the parties to that agreement that the Choctaw and Chickasaw freedmen allotments should retain the status of homesteads. The provisions of Act April 26, 1906, above referred to, construed in the light of all kindred and nearly cotemporaneous legislation, appear to have been intended to more clearly evidence the purpose of Congress manifest in the

Atoka and Supplemental Agreements that the Choctaw and Chickasaw allotments should have the status of homesteads, occasioned no doubt by the difference of opinion which had arisen with regard to the effect of the supplemental agreement. I therefore conclude that the restrictions upon alienation attaching to Choctaw and Chickasaw freedman allotments under the Atoka and Supplemental Agreements were not removed by the act of April 21, 1904.

ˏ As to Alienability of Homesteads of Deceased Seminole Allottees.

[5] The question is presented in the Seminole cases whether after Act March 3, 1903, c. 994, 32 Stat. 982–1008, and prior to the date and issuance of patent, the heirs of a deceased Seminole allottee could alienate the homestead allotment inherited by them.

It has been held by the Supreme Court of Oklahoma, following the reasoning of the United States Supreme Court in Mullen et al. v. United States, cited elsewhere, that after the act of March 3, 1903, all restrictions theretofore existing as to Seminole homesteads were removed by the death of the allottee, and that the delivery of patent was not a necessary essential. Stout v. Simpson (Okl. Sup.) 124 Pac. 754. In the original Seminole Agreement of December 16, 1897, approved by the act of Congress of July 1, 1898 (30 Stat. 567), it was provided that:

"All contracts for sale, disposition or encumbrance of any part of any allotment, made prior to date of patent, shall be void."

In the same agreement it was further provided:

"Each allottee shall designate one tract of forty acres, which shall by the terms of the deed be made inalienable and nontaxable as a homestead in perpetuity."

Section 8 of the act of March 3, 1903, supra, is as follows:

"Sec. 8. That the tribal government of the Seminole Nation shall not continue longer than March fourth, nineteen hundred and six: Provided, that the Secretary of the Interior shall at the proper time furnish the principal chief with blank deeds necessary for all conveyances mentioned in the agreement with the Seminole Nation contained in the act of July first, eighteen hundred and ninety-eight (Thirtieth Statutes, page five hundred and sixty-seven), and said principal chief shall execute and deliver said deeds to the Indian allottees as required by said act, and the deeds for allotment, when duly executed and approved, shall be recorded in the office of the Dawes Commission prior to delivery and without expense to the allottee until further legislation by Congress, and such records shall have like effect as other public records: Provided further, That the homestead referred to in said act shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment. A separate deed shall be issued for said homestead, and during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof."

Each Seminole allottee, by virtue of the allotment, prior to patent, had a complete, equitable interest in the land allotted to him, the inalienability of which, where it was inalienable, was not due to the quality of the interest of the allottee, but to the express restriction imposed. This equitable interest was one which, in the absence of restriction, the allottee could convey, and it was a descendible interest.

Goat v. United States, 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. 841, decided by the United States Supreme Court April 29, 1912. The effect of the provisions quoted from the original Seminole Agreement was to place on the homestead a restriction upon alienation in perpetuity, and upon the surplus a restriction upon alienation until execution of patent. Here was an express perpetual restriction upon alienation, so far as the homestead was concerned. The issuance of patent in no way affected or modified that. But as to the surplus, the provision voiding contracts for sale, disposition, or incumbrance prior to the date of patent fixed the term of restriction upon such land and limited it to date of patent. Five years later, in section 8 of the act of March 3, 1903, above quoted, Congress decided to reduce the term of inalienability attaching to homesteads from a perpetuity to that of a term comprising the lifetime of the allottee, not exceeding 21 years from the date of the deed for the allotment. By this latter legislation Congress expressly provides that the homestead shall be inalienable for the term fixed. If the allottee lived more than 21 years after the date of the deed to his allotment, the restriction expires at the end of such 21 years and before his death. If he die before the expiration of such period, then, by the express terms of the act, his death ends the period of restriction. It is to be noted that section 8 of the latter act is not, in terms, an amendment of the original agreement, to be read into it as if all had been enacted at the same time. The restriction period as to homesteads provided by section 8 is complete in itself. The provision that such homesteads shall be inalienable during the terms mentioned is equivalent to saying that the restriction shall not continue longer. We have seen that, but for the express restrictions imposed, the equitable interest vested in the allottee prior to patent is alienable. It follows that, when the restriction term expired by death prior to patent, the equitable, descendible interest became immediately alienable in the hands of the heirs.

### As to Alienability of Homesteads of Deceased Creek Allottees.

[6] In the Creek cases is argued and involved the question whether or not the homestead restriction of 21 years, or during the life of the allottee, is a restriction added to and involving the general five years restriction; that is, whether or not the devisees or heirs of a deceased Creek allottee could sell the homestead immediately after his death, notwithstanding less than five years had elapsed since the approval of the Creek Supplemental Agreement.

In the Creek Supplemental Agreement (Act June 30, 1902, c. 1323, 32 Stat. 500), it was provided:

"16. Lands allotted to citizens shall not in any manner whatever, or at any time, be encumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear.

Selections of homesteads for minors, prisoners, convicts, incompetents, and aged and infirm persons, who can not select for themselves, may be made in the manner provided for the selection of their allotments, and if for any reason such selection be not made for any citizen it shall be the duty of said Commission to make selection for him. The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed. Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its validity."

This section is substantially the same as section 7 of the original Creek Agreement (Act March 1, 1901, c. 676, 31 Stat. 861), except that it changes the date from which the five-year limitation is to run and the law of descent which controls.

It is contended by the government that the five-years limitation prescribed in both sections is the "basic" limitation attaching to all the land, inclusive of homestead; that then the homestead limitation of 21 years attaches as a sort of special limitation added to the former, so far as homesteads are concerned; and that in the portion of the section providing that in the absence of children born after May 25, 1901, the allottee may dispose of his homestead by will "free from the limitation herein imposed," and, if this be not done, the land embraced in his homestead shall descend to his heirs, free from "such limitation," the "limitation" referred to as being removed is solely the 21-years limitation upon alienation of homesteads, leaving still upon the land and running with it into the hands of the devisees or heirs the 5-years limitation upon alienation above referred to; so that, if within 5 years from the date of the approval of the agreement the allottee should die, leaving no children born after May 25, 1901, having made a will devising his homestead, the devisees would be relieved of the 21-years restriction, but not of the 5-years restriction, and could not dispose of the land until the expiration of the 5 years; and that in such case, in the absence of a will, the heirs could not dispose of the homestead during such five years, although they were relieved of the 21-years restriction. This is the construction placed upon section 7, above referred to, by the Supreme Court of Oklahoma in the case of Barnes v. Stonebraker, 28 Okl. 75, 113 Pac. 903, following a decision of Hon. Frank L. Campbell, an attorney of the Interior Department, rendered in August, 1906. In view of the rule that the departmental construction placed upon an act affecting a matter of which a department has control should be a very persuasive element for the court's consideration in determining the meaning of the act, and the further fact that the Supreme Court of the state has concurred in such construction, I should be very loath not to follow them. But as these decisions are only persuasive, and not controlling, so far as this court is concerned, and the question is now presented to me for determination, if on consideration of the sections involved they shall not appear to my mind to be reasonably susceptible of the

construction above given, then, of course, it will be my duty to follow my own convictions.

If the contention of the government is correct, then the Creek Agreement in respect to alienation of homesteads by the heirs after the allottee's death is different from that of any other of the Five Civilized Tribes. For reasons stated elsewhere in this opinion, it is determined that subsequent to the act of March 3, 1903, Seminole homesteads were alienable by the heirs immediately upon the death of the allottee. Stout v. Simpson, supra. This was also true of the Cherokees as appears from sections 13, 14, and 15 of the Cherokee Agreement. Act July 1, 1902, c. 1375, 32 Stat. 716. It was also true of the Choctaws and Chickasaws. Mullen v. United States, supra.

In view of the uniformity of so many features of the plan appearing in the legislation relating to the several tribes, so far as allotments are concerned, and especially the uniformity of the provisions regarding homesteads, it may, I think, be safely assumed that Congress and the Creek Nation intended that the death of the allottee in the absence of children born after May 25, 1901, should effect the removal of all restrictions upon the homestead, the same as in all the other tribes, if the language of the agreement is reasonably susceptible of such construction; and a different construction should not be given it, unless it is clearly sustained by that language.

It is first provided that lands allotted to citizens shall not in any manner whatever, or at any time, be incumbered, taken, or sold, to secure or satisfy any debt or obligation, without the Secretary's approval, before the expiration of 5 years from the date of the approval of the agreement. This is equivalent to saying that during such period the land shall be free from any incumbrance. It is then provided that during the same period the land shall not be alienated by the allottee or his heirs. This is equivalent to saying that the land shall be inalienable by the allottee or his heirs, without the Secretary's approval, during such period. Then following, the homestead is taken up separate and distinct from the surplus, and, as to that, it is provided that it shall be and remain nontaxable, inalienable, and free from any incumbrance for 21 years from the date of the deed therefor. Identically the same restrictions as to incumbrance and sale are placed upon the homestead as upon the surplus, except that the term of their existence is made 21 years, instead of 5 years. As further evidencing the intention in the minds of the parties to the agreement to make separate and distinct provisions complete in themselves, respectively, as to the surplus and homestead, is the provision that for the homestead a separate deed shall be issued, in which "this condition" shall appear. What condition? Evidently not the 5-years restriction first provided, but the 21-years restriction provided especially for the homestead. These are the provisions of the first paragraph of section 16. It has two paragraphs. The second, after providing for selections for minors, incompetents, etc., and where the allottee shall fail to make his selection, proceeds:

"The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will,

free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed.  Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its validity."

This provision is not treating alone of cases where the allottee shall die after the expiration of the five-years period, but clearly contemplates as well deaths which may occur within that period.  In either event, it is provided that in the absence of children born to him after May 25, 1901, the allottee may dispose of his homestead by will, and, if this be not done, it shall descend to his heirs, in either case free from "the limitation herein imposed."  Wherein imposed?  Evidently not in the second paragraph, for the limitation imposed in that paragraph has relation to a case where children are born after May 25, 1901, and we are now contemplating a case where there are no such children.  Clearly we must find the limitation referred to in the first paragraph of the section.  But there we find two different limitations, one for a term of 5 years, and the other for a term of 21 years.  Each is imposed in the first paragraph, and may therefore be referred to as "herein imposed"; and it is the contention of the government that the parties to the agreement intended they should both apply to the homestead.  But the singular is used; only one limitation is referred to, which the government contends evidences an intention not to remove both limitations.  It is further contended that the limitation referred to is the 21-years restriction and not the 5-years restriction.  But they are both "herein imposed," and if, as contended, both apply to the homestead, then what warrant is there for holding that the term "limitation" has reference to the 21-years restriction, rather than the 5-years restriction?  If it had been in the minds of the parties to the agreement that both the 5-years and 21-years limitations should attach to the homestead, and it was their intention to remove only the 21-years limitation and not the 5-years limitation, both limitations being "herein imposed," would they not have specified to which limitation reference was made?  That they did not do so, and that they seem to have contemplated that as to homesteads there was but one limitation, "herein imposed," leads, I think, reasonably to the conclusion that they intended that as to homesteads only the 21-years restriction should apply, and that the 5-years restriction was confined in its effect to surplus.  This is borne out by the provision that the allottee may dispose of the homestead by will.  As said in United States v. Schurz, 102 U. S. 378, 26 L. Ed. 167:

"Blackstone describes four modes of alienation or transfer of title to real estate, which he called common assurances, the first of which is by matter in pais, or deed, the second by matter of record, or an assurance transacted only in the King's public courts of record, the third by special custom, and the fourth by devise in a last will or testament."

In Burbank v. Rockingham Insurance Co., 24 N. H. 550, 57 Am. Dec. 300, it is said:

"As understood at common law, to alienate real estate is voluntarily to part with the ownership to it, either by bargain and sale, or by some con-

veyance, or by gift or will. The right to alienate was a right which the owner had over the real estate to divert it from the heir. Alienation differs from descent, in this: that alienation is effected by the voluntary act of the owner of the property, while descent is the legal consequence of the decease of the owner, and is not changed by any previous act of volition of the owner. A sale and conveyance is an alienation that takes effect from the time of the transfer, while a devise is an alienation that takes effect on the decease of the testator, according to the terms of the will. But property not transferred or devised is not alienated, according to the principles of the common law."

Now as the making of a will is an alienation, and the death of the testator makes the will effectual to immediately pass title to the devisees, and we have seen that, so far as the homestead is concerned, the death of the allottee is made to have the same effect in the absence of children born after May 25, 1901, whether it occur before or after the expiration of the 5 years, it follows that to permit the making of a will within the 5-years period is to permit alienation within that period, should the allottee after making the will die within the period. So far, then, as disposition of the homestead by will is concerned, the allottee is clearly permitted to alienate within the 5-years period, if by his death during the period the will becomes effective. It would, I think, be absurd to say, in view of the clear language of the section, that, if the allottee died testate within the 5-years period, the devisee or devisees, who might all be persons not of Indian blood, and as to whom the government owed no duty of guardianship or protection such as it owes its Indian wards, must not themselves alienate the land until the expiration of the 5-years period. Therefore, as to devisees, it seems clear that in the limitation from which the land is freed in their hands are contemplated all the restrictions theretofore imposed upon the land. And it is freedom from the same limitation which the heirs of the deceased enjoy in case no will is made. I therefore conclude, in view of the entire section, studied in the light of cotemporaneous legislation regarding the other tribes, and the purposes sought to be accomplished, that the only reasonable construction is that the parties to the agreement intended that upon the death of the Creek allottee, in the absence of the children mentioned, whether before or after the expiration of the 5-years restriction period affecting his surplus his homestead allotment should become immediately alienable by his devisees in case of will, and by his heirs in the absence of a will.